*In re* ESTATE OF JOAN OHLMAN, alleged to be a Disabled Person (Office of State Guardian, Petitioner-Appellee, v. Joan Ohlman, Respondent-Appellant).—THE DEPARTMENT OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES, Appellant, v. JOAN OHLMAN, Appellee.

First District (2nd Division)   Nos. 1—91—1308, 1—91—2526,
1—91—3088 cons.

Opinion filed February 22, 1994.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Daniel N. Malato, Assistant Attorney General, of counsel), for appellant Department of Mental Health and Developmental Disabilities.

Patricia K. Hogan, of Chicago, for appellant Joan Ohlman.

Office of State Guardian (James B. Moses, Jr., and Laura Sakas, of counsel) and Legal Assistance Foundation of Chicago (Wallace C. Winter and Deborah A. Brotz, of counsel), both of Chicago, for appellee.

JUSTICE McCORMICK delivered the opinion of the court:

Joan Ohlman appeals from an order appointing the Office of State Guardian as Ohlman's plenary guardian in docket number 1—91—1308. Following the appointment, the Office of State Guardian sought approval of antipsychotic drug therapy. The trial court entered two interlocutory orders in the course of proceedings on the petition which directed the Department of Mental Health and Developmental Disabilities (the Department) to engage in specified therapies for Ohlman for six-week periods. The Department appeals from the two interlocutory orders in docket numbers 1—91—2526 and 1—91—3088.

We find that the trial court did not follow statutory procedures by permitting Ohlman to represent herself in the proceeding. Therefore, in part I of the opinion we reverse the appointment of the Office of State Guardian as plenary guardian of Ohlman.

In part II we find that the trial court ordered specific treatment for Ohlman without adequate testimony from qualified professionals to warrant imposition of the course of treatment specified. Therefore, we reverse the interlocutory orders.

I

The Illinois State Psychiatric Institute (ISPI), a mental health facility the Department operates, admitted Joan Ohlman following her involuntary commitment to the Department in March 1990. On July 10, 1990, the Office of State Guardian petitioned the probate division of the circuit court of Cook County for appointment of a guardian for Joan Ohlman. After a brief hearing at which Ohlman, who had no counsel, did not contest the petition, the trial court appointed a plenary guardian on the basis of a one-page report by Dr. James Patras. In the report Dr. Patras stated that Ohlman suffered from a schizoaffective disorder with paranoid delusions and that she was unable to make decisions about her personal health. The trial court also appointed an attorney, Patricia Hogan, to represent Ohlman in further proceedings. In the order appointing Hogan the trial court stated: "Appointment of a Guardian ad Litem is waived."

Hogan filed a petition to vacate the order appointing a guardian. The trial court granted that petition and set the petition for appointment of a guardian for a contested evidentiary hearing on January 28, 1991. At the hearing Ohlman stated that she wished to represent herself. Hogan told the trial court that she consulted with Ohlman, who permitted her to file the motion to vacate, but she told Hogan that she would represent herself at the hearing. Hogan raised no objection to Ohlman representing herself, but she said because of that choice Hogan was in court "to assist" Ohlman. Hogan told the trial court, "I think she has a right to represent herself." The court

discharged Hogan from her appointment as attorney for Ohlman. Although the record does not clearly indicate whether Hogan remained in court, she said nothing through the remainder of the hearing and effectively provided Ohlman no assistance.

Dr. Patras testified that Ohlman had a history of psychotic symptoms which led to seven voluntary hospitalizations between 1980 and 1989. Her prior hospitalization, which lasted from November 1989 until February 1990, ended when Ohlman signed herself out of ISPI with substantial funds but with no place to stay. She lived at O'Hare Airport until her money was stolen, and then airport personnel referred her back to the hospital. Dr. Patras saw Ohlman in individual therapy sessions twice a week, and he saw her another two times a week on regular rounds. She refused treatment for an infection in her legs, which she attributed to a machine controlled by the President of the United States. Ohlman also refused to take the antipsychotic medication her doctors prescribed. In Dr. Patras' opinion, Ohlman was not capable of making decisions concerning her medical treatment or her living arrangements.

Patricia Hansen, a social worker at ISPI, testified that Ohlman mostly avoided activities available at ISPI. She interacted with staff as little as possible and she avoided other patients altogether. Hansen tried to work with Ohlman to develop a discharge plan. Ohlman said she would stay at a hotel for transients, and she rejected Hansen's suggestion of a structured living environment where staff could help her. Ohlman asked no questions of either witness.

Ohlman testified that she was not mentally ill and she chose not to see doctors. After she signed out of ISPI in February 1990, she "was manipulated to O'Hare Airport," although she would not say how or by whom. She testified that she "was informed" that the people she had thought were her parents "were computers pretending to be" her parents. She said she wanted a "financial settlement *** [of] 105 million dollars" from the "people that have harmed" her, so that she can leave ISPI and "have a nice life." She could not tell the trial court who harmed her. When the trial court asked if she had other witnesses she said, "I choose to say nothing else unless that is a problem with the request that I have given you about the settlement." The court explained that she would not receive a financial settlement in these proceedings.

The trial court found Ohlman disabled and "totally without understanding or capacity" to make responsible decisions regarding herself. The court based its findings on all the testimony and Dr. Patras' report. By order dated January 28, 1991, the trial court again appointed the Office of State Guardian as Ohlman's plenary guard-

ian. The court appointed Hogan to assist Ohlman with this appeal. The probate division of the circuit court then transferred the case to the county division to consider the State Guardian's petition for administration of antipsychotic medication.

■ Ohlman asks this court to assume jurisdiction over her appeal pursuant to Supreme Court Rule 301 (134 Ill. 2d R. 301), arguing that the order appointing a guardian was a final judgment. We disagree. The trial court retained jurisdiction to determine substantial rights of the parties following the appointment of a guardian, so the appointment was not a final disposition of the entire proceeding. (See *Mendelson v. Lillard* (1980), 83 Ill. App. 3d 1088, 1092, 404 N.E.2d 964.) Instead, we find that we have jurisdiction under Supreme Court Rule 304(b)(1), which provides that "[a] judgment or order entered in *** [a] guardianship *** proceeding which finally determines a right or status of a party" is an appealable judgment although it does not dispose of an entire proceeding. 134 Ill. 2d R. 304(b)(1).

●2 Ohlman argues that the finding of disability and the appointment of a guardian are contrary to the manifest weight of the evidence. The Probate Act of 1975, which governs proceedings for appointment of guardians, defines a disabled person as a person who "is mentally ill *** and who because of his mental illness *** is not fully able to manage his person or estate." (Ill. Rev. Stat. 1991, ch. 110$^{1}$/$_{2}$, par. 11a—2(b).) Under section 11a—3 of the Probate Act:

> "[T]he court may adjudge a person to be a disabled person and may appoint (1) a guardian of his person, if because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person, or (2) a guardian of his estate, if because of his disability he is unable to manage his estate or financial affairs, or (3) a guardian of his person and of his estate." Ill. Rev. Stat. 1991, ch. 110$^{1}$/$_{2}$, par. 11a—3(a).

Ohlman cites *In re Phillips* (1978), 62 Ill. App. 3d 408, 379 N.E.2d 97, as authority showing that the evidence here does not support appointment of a guardian. In *Phillips* a psychiatrist testified that Phillips was schizophrenic, and she had no plans for taking care of herself if she left the hospital. The trial court ruled that Phillips was subject to involuntary commitment under the Mental Health and Developmental Disabilities Code (Mental Health Code). (Ill. Rev. Stat. 1977, ch. 91$^{1}$/$_{2}$, par. 1—11.) The Mental Health Code defined a person subject to involuntary admission as one who is "afflicted with a mental disorder *** [and], as a result of such mental disorder, *** is unable to care for himself so as to guard himself from physical injury or to provide for his own physical needs." (Ill. Rev. Stat. 1977, ch.

$91^1/_2$, par. 1—11.) The appellate court reversed the decision of the trial court because the evidence was insufficient to show that Phillips needed involuntary commitment to protect her from serious harm.

■ Here, to justify appointment of a plenary guardian, the court needed to find that Ohlman lacked understanding or capacity to make responsible decisions concerning her person and her assets. While the evidence here is similar to that in *Phillips*, the trial court's findings here are not like the findings overturned in *Phillips*. The trial court's appointment of a guardian hinges on Ohlman's capacity to make responsible decisions rather than her need for protection from serious harm. Dr. Patras testified that Ohlman refused medical treatment for her leg infection because she thought the swelling was caused by a machine which the President of the United States controlled. Hansen testified that Ohlman refused to work on a reasonable plan for living arrangements following discharge. Ohlman testified that she just needed a settlement of $105 million, which she apparently expected the trial court to award her in this proceeding, to live a nice life. This evidence amply supports the trial court's finding that Ohlman was not fully capable of making responsible decisions concerning either her person or her financial affairs. The trial court's order appointing a plenary guardian is not contrary to the manifest weight of the evidence.

Ohlman argues that the appointment of a guardian must be reversed because the trial court cited Dr. Patras' report as support for its order, although the report was not formally admitted into evidence at the hearing. Dr. Patras submitted his report with the petition for appointment of a guardian, as required by section 11a—9 of the Probate Act, which provides that

> "any report prepared pursuant to this Section *** shall be available to the court or an appellate court in which the proceedings are subject to review, to the respondent, the petitioner, and their attorneys, to the respondent's guardian ad litem, and to such other persons as the court may direct." (Ill. Rev. Stat. 1991, ch. $110^1/_2$, par. 11a—9(c).)

Since the legislature expressly directed that the report must be available to the court and to the parties, we find that the legislature intended the court to consider the report in light of any evidence the parties produce either in support or opposition to the recommendations of the report. The court here properly considered Dr. Patras' report in making its findings, although the report was never formally admitted into evidence.

■ Finally, Ohlman contends that the trial court committed reversible error when it allowed her to represent herself. The Probate Act provides:

"The court shall appoint a guardian ad litem to represent the respondent, except that the appointment of a guardian ad litem shall not be required when the court determines that such appointment is not necessary for the protection of the respondent or a reasonably informed decision on the petition." (Ill. Rev. Stat. 1991, ch. 110½, par. 11a—10(a).)

The statute makes no provision for waiver of a guardian *ad litem*. On the contrary, the court must appoint a guardian *ad litem* unless the court has grounds for finding that the respondent does not need a guardian *ad litem*. (See Jost, *The Illinois Guardianship for Disabled Adults Legislation of 1978 and 1979: Protecting the Disabled from Their Zealous Protectors*, 56 Chi.-Kent L. Rev. 1087, 1092-93 (1980).) While this determination might be, in some cases, based on a preliminary finding that the respondent can competently protect his own interests, when the respondent has already been involuntarily committed as mentally ill and a danger to himself or others, the court must presume that the respondent is not capable of protecting his interests. See *Kirkland v. Kirkland* (1962), 38 Ill. App. 2d 280, 287, 186 N.E.2d 794.

The court here appointed an attorney but no guardian *ad litem* for respondent. The statute permits this procedure: The court could determine that the attorney can provide the protection for respondent which would otherwise be the guardian *ad litem*'s responsibility, and the attorney can help the court arrive at a reasonably informed decision on the petition for guardianship. Thus, the appointment of a separate guardian *ad litem* would be unnecessary. However, if the court refuses to appoint a guardian *ad litem* on this basis, it effectively requires the attorney to act as both the respondent's attorney and as guardian *ad litem*.

The court's order appointing an attorney for respondent stated that the appointment of a guardian *ad litem* was waived. It did not establish that the court expected the attorney to act as guardian *ad litem*, too. If no conflict arose between Hogan's duties as guardian *ad litem* and her duties as attorney, the court's failure to specify that she was also acting as guardian *ad litem* might have made no difference. However, the two roles came into conflict when Ohlman told Hogan that she wanted to represent herself. At that point the attorney had a duty to protect Ohlman's asserted right to represent herself, while the guardian *ad litem* had a duty to oppose that self-representation if, in the guardian's independent opinion, Ohlman was not capable of protecting her interests, so that her self-representation was not in her best interests. As one commentator explained, a guardian *ad litem* is responsible for "representing the

respondent's best interests as opposed to serving as an advocate for the respondent's possibly ill-advised desires." Jost, 56 Chi.-Kent L. Rev. at 1094.

Once this conflict between the roles of attorney and guardian *ad litem* arose, the appointment of an attorney no longer met the statutory requirement for appointment of a guardian *ad litem*. While the attorney should have brought the need for appointment of a guardian *ad litem* to the trial court's attention, her failure to do so cannot relieve the court of its responsibility for making the required appointment to protect the interests of the alleged incompetent. See *In re Estate of Berger* (1987), 166 Ill. App. 3d 1045, 1055, 520 N.E.2d 690.

The trial court needed information which only a guardian *ad litem* could provide before deciding whether to require Ohlman to retain counsel against her express wish to represent herself. The Probate Act provides:

"The court (1) may appoint counsel for the respondent, if the court finds that the interests of the respondent will be best served by the appointment, and (2) shall appoint counsel upon respondent's request or if the respondent takes a position adverse to that of the guardian ad litem." (Ill. Rev. Stat. 1991, ch. 110$^1$/$_2$, par. 11a—10(b).)

Respondent did not request counsel and she took no position adverse to counsel. The use of "may" in the statute indicates that appointment of counsel, under these circumstances, is within the discretion of the trial court (see *Rankin v. Rankin* (1944), 322 Ill. App. 90, 92-93, 54 N.E.2d 58), and the court should make the appointment only if it finds the appointment to be in the respondent's best interests. Neither Ohlman nor her attorney presented to the trial court any basis for finding the appointment of counsel to be in Ohlman's best interests. If Ohlman's attorney had acted as guardian *ad litem* and informed the trial court that Ohlman's self-representation could be contrary to her interests, the attorney may have breached her duties as attorney. We find that Hogan, by her statement that Ohlman had the right to represent herself, indicated nothing about whether Ohlman's interests would be served by the appointment of counsel. The trial court needed the input of a guardian *ad litem*, free from conflicting duties as attorney, to help the court decide whether to appoint counsel for Ohlman against her wishes.

The evidence at the hearing showed, as the trial court found, that Ohlman was "totally without understanding or capacity" to make responsible decisions concerning her person or her assets. Certainly when Ohlman testified in court the trial court should have

recognized that she could not protect herself and that she needed assistance in court. Without strong evidence that the appointment of counsel was not in her best interests, at that point the trial court should have reversed its prior decision to allow her to represent herself. Instead, the court allowed Ohlman to proceed with the assistance of neither counsel nor a guardian *ad litem*.

The trial court committed reversible error when it failed to appoint a separate guardian *ad litem* to protect Ohlman's interests once Ohlman asserted the right to proceed without the assistance of counsel. The trial court should have allowed the guardian *ad litem* time to discuss Ohlman's needs and interests with Ohlman, her attorney, and the staff at ISPI treating Ohlman, so that the guardian could responsibly present to the court information which the court needed for deciding whether Ohlman's interests would be best served by appointment of counsel. The order appointing the Office of State Guardian as plenary guardian for Ohlman is reversed.

## II

On February 7, 1991, the Office of State Guardian petitioned for approval of antipsychotic drug therapy for Ohlman. The trial court appointed counsel to assist Ohlman in contesting the petition, and the court separately appointed a guardian *ad litem*. At the hearing on July 11, 1991, the Office of State Guardian presented Dr. George Collins, a family practitioner, who testified that in his opinion Ohlman could take "the usual dose" of Haldol, the antipsychotic which Ohlman's doctors had prescribed, with little risk of untoward physical effects.

Ohlman's attorney called her to testify. She refused to answer his questions, but when the trial court indicated that it would stop the questioning, Ohlman volunteered: "A person who is called Gateman *** has tried to kill me with drugs and he is being stopped." Later she said, "Gateman will be killed because he will not stop trying to kill me."

Dr. Stephen Fox, an osteopath, testified that Ohlman's symptoms, such as flat affect, social isolation, and failure to cooperate with treatment, were unlikely to respond to antipsychotic medication, which had more effect on hallucinations, delusions and impulse-control problems. In his opinion, Ohlman should not receive any antipsychotic medication without her consent. She told him that all medicines were poisons. He agreed with Dr. Collins that Ohlman's medical record did not indicate any condition which would make administration of antipsychotics a special risk. He said that he thought one-on-one psychotherapy would work. He did not specify

how often he thought she should receive individual psychotherapy sessions.

Ohlman interrupted the questioning to tell the trial court that she wanted to leave the hospital grounds for longer periods than she had been given. ISPI had allowed her off grounds only to come to court. Neither Hansen nor Patras at the earlier hearing, nor Fox nor Collins had ever mentioned off-grounds passes. No evidence in the record pertained to the feasibility or desirability of off-grounds passes for Ohlman.

Following consultation with the attorney for the Office of State Guardian, the guardian *ad litem* and Ohlman's attorney, on July 12, 1991, the trial court ordered ISPI to give Ohlman "one-on-one psychotherapy, 30 minutes per day, 5 days per week for six weeks" and "an off-grounds pass every other week, for a minimu[m] 2 hour period each time." The trial court made no ruling on the petition for approval of antipsychotic drug therapy, setting that matter for determination on August 27, 1991. The court characterized the order as an "agreed order" although the court never consulted or sought agreement from the only persons it considered bound to follow the order, the staff at ISPI. The Department appeals from the order dated July 12, 1991, in docket number 1—91—2526.

At the follow-up hearing on August 27, 1991, Dr. Patras reiterated Ohlman's symptoms and concluded that she suffered from chronic schizophrenia for which treatment with Haldol was appropriate. She generally refused to take the "average starting dose" of 35 milligrams twice daily which he prescribed. He had continued individual psychotherapy sessions, but Ohlman mostly refused to participate. Her condition had deteriorated since the last time Patras testified, due to the lack of medication. He recommended use of antipsychotic drugs in conjunction with psychotherapy.

Dr. Patras testified that the hospital administered Haldol to Ohlman a few times with her consent, but her condition did not improve because she did not take the drug with sufficient regularity. When Ohlman lost control and the staff perceived her to be a danger to herself or others, the staff administered five milligrams of Haldol to stop the immediate dangerous behavior. Dr. Patras was not surprised that her condition had not shown long-term improvement despite the occasional medication: he "would not expect [long-term improvement] unless she was taking the Haldol on a regular basis so that a therap[e]utic blood level would be achieved."

Dr. Patras had not attempted to hold individual psychotherapy sessions with Ohlman five days a week, partly because she did not participate in the sessions and because

"psychotherapy this intensive in a patient with the degree of paranoia that the respondent has displayed could actually lead to a backfiring. In other words, it could worsen actually the paranoia meeting with []her five times a week."

The clinical team decided that Ohlman's condition did not warrant giving her an off-grounds pass. She did not leave the hospital between court dates.

Ohlman's attorney made an oral motion to find the Department in contempt for failure to comply with the trial court's order of July 12, 1991. The court took the motion under advisement. At the conclusion of the hearing, the court ordered "five days per week one on one psychotherapy in connection with Haldol," and an "off-grounds pass every other week." In its written order dated September 5, 1991, the trial court authorized the Office of State Guardian "to consent to the administration of: Haldol, 5 mg twice daily." The court continued the case for further hearing on October 15, 1991. The Department, in docket number 1—91—3088, appeals from the order dated September 5, 1991.

On October 16, 1991, the trial court entered an order allowing the State Guardian to consent to administration of 20 milligrams Haldol twice daily. The court also ordered the Department to document Ohlman's refusals to accept off-grounds passes. The Department has not appealed from the order. The record shows no final disposition of Ohlman's petition for a rule to show cause why the Department should not be held in contempt for failure to comply with the order dated July 12, 1991.

■ The Department contends that this court has jurisdiction to consider the appeals from the orders dated July 12 and September 5, 1991, under Supreme Court Rule 307(a)(1), which permits interlocutory appeal from injunctive orders. (134 Ill. 2d R. 307(a)(1).) This court looks to the substance, not the form, of a trial court's order to determine whether it is appealable under Rule 307. (*Lake Shore Racquet Club, Inc. v. Fireman's Fund Insurance Cos.* (1980), 91 Ill. App. 3d 1118, 1121, 415 N.E.2d 625.) An order constitutes an appealable injunction if it requires a person " 'to do a particular thing, or to refrain from doing a particular thing, according to the exigency of the writ, the most common sort of which operate as a restraint upon the party in the exercise of his real or supposed rights.' " *In re A Minor* (1989), 127 Ill. 2d 247, 261, 537 N.E.2d 292, quoting *Wangelin v. Goe* (1869), 50 Ill. 459, 463.

The orders here directed the Department to give Ohlman 30 minute individual psychotherapy sessions five days per week. The orders require the Department to do a particular thing, and they operate as

constraints on the Department's right to determine proper treatment for its patients. (See *H.T.A., Ltd. v. Luxion* (1991), 211 Ill. App. 3d 739, 743-44, 570 N.E.2d 599.) Therefore we have jurisdiction to review both orders under Rule 307.

The trial court entered an order on October 16, 1991, which rendered the orders appealed from ineffective as of that date. The Department has not appealed from the October 16 order. That order does not make the Department's appeal moot. Generally, the mootness doctrine does not apply to mental health cases. (*In re Venegas* (1991), 218 Ill. App. 3d 423, 424, 578 N.E.2d 43.) Ohlman's petition for a finding of contempt for violation of the orders shows that the parties still actively dispute the propriety of the interlocutory injunctive orders, although they are no longer in effect. See *In re A Minor*, 127 Ill. 2d at 256-57.

Neither does our decision in part I of this opinion dispose of the issues in this appeal. Although the Office of State Guardian was not properly appointed guardian, it had authority to petition for administration of psychotropic medication. The Mental Health Code provides that "[a]ny person 18 years of age or older, including any guardian, may petition the circuit court for an order authorizing the administration of psychotropic medication to a recipient of services." Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 2—107.1(a); see also 9 U.L.A. 467-68 (1988).

■ The parties agree that the trial court had the power to order a specific treatment plan for Ohlman, and they agree that such a court order must be based on factual evidence in the record. (See *People v. Valdez* (1980), 79 Ill. 2d 74, 84-86, 402 N.E.2d 187.) The trial court found that section 3—814 of the Mental Health Code authorized it to specify treatment. (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 3—814.) Section 2—107.1(c) of the Mental Health Code makes section 3—814 applicable to proceedings for administration of psychotropic medication, like antipsychotics, against a patient's will. (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 2—107.1(c).) Section 3—814 grants the court the power to modify orders for commitment and treatment if the court is not satisfied that the patient is benefiting from the treatment he is receiving.

This statutory power does not permit the court to prescribe treatment, as that power is granted only to licensed health care professionals. (Ill. Rev. Stat. 1991, ch. 111, par. 4400—49(iii).) Courts have repeatedly emphasized that they "may not involve themselves in treatment decisions" (*In re Kolodrubetz* (Minn. App. 1987), 411 N.W.2d 528, 533), because a decision concerning proper treatment "is a judgment that can only be made by an expert with the opportunity

to consider all the facts of the case." (*Reiser v. Prunty* (1986), 224 Mont. 1, 13, 727 P.2d 538, 546; see *In re Ingersoll* (1989), 188 Ill. App. 3d 364, 368, 544 N.E.2d 409.) Thus, all treatment plans and their modifications must ultimately come from physicians authorized to prescribe the treatment. The court's power to modify the plans is, accordingly, limited to approving or disapproving modifications of the treatment plans where persons properly licensed to prescribe treatment have testified in support of the precise course of treatment the court may approve in its order.

■ Here Dr. Fox testified that ISPI should give Ohlman one-on-one psychotherapy, and he did not believe that any antipsychotic drugs administered without her consent would be effective. He did not recommend any specific frequency of psychotherapy sessions and he did not give any testimony regarding the effectiveness or desirability of varying levels of antipsychotic medication. Dr. Patras prescribed two individual psychotherapy sessions per week, in conjunction with 35 milligrams of Haldol administered twice daily. Dr. Patras testified that the hospital had on occasion given Ohlman five milligrams of Haldol to stop immediate dangerous behavior. He testified that Ohlman needed to take greater amounts on a regular basis to raise the level of antipsychotic medication in her blood to the point where she could begin to benefit.

The trial court ordered five psychotherapy sessions a week, although no qualified professional ever recommended that modification of the treatment plan. At the hearing held after the trial court entered the first order for such session, Dr. Patras testified that the five days a week of psychotherapy which the court ordered could actually lead to a worsening of Ohlman's paranoia. Especially without antipsychotics Dr. Patras thought necessary to help Ohlman organize her disordered thought processes, the intense interaction could further convince her that the doctor and others were out to destroy her. The orders for five psychotherapy sessions per week are not supported by the evidence, and therefore we reverse that part of the orders of July 12 and September 5, 1991.

The trial court also limited the antipsychotic drug therapy to five milligrams of Haldol administered twice daily, although no qualified professional recommended that course of treatment. While Dr. Patras testified that the hospital had occasionally administered that amount to bring Ohlman's immediately dangerous behavior under control, the court heard no testimony at all concerning the likely effect of a daily regimen at that dosage. The evidence in the record supports the conclusion that five milligrams of Haldol would be too little to have much effect on her disordered thoughts, although it

might be enough to help the staff restrain her in emergency situations. At only five milligrams of Haldol administered twice daily, the Haldol in Ohlman's blood would not reach therapeutic levels for a more substantial period of time that she would need if she took the prescribed dose. While the Haldol was building up to therapeutic levels, Ohlman's thoughts might remain disordered and she would be receiving medication against her will, again possibly feeding into her paranoid belief that the staff was poisoning her. Since the order limiting the guardian's authority to approval of five milligrams of Haldol given twice daily is not supported by evidence in the record, that part of the September 5, 1991, order is reversed.

Finally, the court heard no testimony supporting the award of off-grounds passes, so that part of the orders must also be reversed. Since the trial court here effectively prescribed treatment it thought best without testimony supporting the specific treatment ordered, the orders of July 11 and September 5, 1991, must be reversed.

No. 1—91—1308, Reversed and remanded.
Nos. 1—91—2526 and 1—91—3088, Reversed.

HARTMAN and SCARIANO, JJ., concur.