NO. 4-96-1018

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

BLOOMINGTON UROLOGICAL ASSOCIATES, SC, ) Appeal from

Plaintiff-Appellee, ) Cir­cuit Court of 

v.   ) McLean County 

BENNETT SCAGLIA, M.D., ) No. 96L128

Defendant-Appellant. ) 

) Honorable 

 ) W. Charles Witte,

) Judge Presiding.

_________________________________________________________________

PRESIDING JUSTICE STEIGMANN delivered the opinion of 

the court:

In September 1996, the trial court entered an agreed order between defendant, Bennett Scaglia, M.D., and plaintiff, Bloomington Urological Associates, SC (Bloomington Urological), re­spect­ing a covenant not to compete.  In December 1996, the court found Scaglia in indirect civil contempt for violating the agreed or­der.  Scaglia ap­peals, arguing that (1) the court's finding of con­tempt was against the mani­fest weight of the evi­dence; and (2) the court improper­ly al­tered the terms of the agreed order after finding him in contempt.  Because we agree with Scaglia's first argument, we reverse.

I. BACKGROUND

In May 1994, Scaglia and Peoria Urological Associ­ates, SC (Peoria Urological), en­tered into an employment agree­ment, and in June 1996, Peoria Urological assigned the agreement to Bloomington Urological.  Section 5.2(d) of the employment agree­ment pro­vid­ed that upon termination of his employment, Scaglia 

would not "engage in the [b]usiness" from any office located with­in a 50-mile radius of any Bloomington Uro­logi­cal of­fice for a 12-month peri­od.  Section I.A. of the employment agreement de­fined "the '[b]usiness'" as "the provision of medical services." 

Scaglia subsequently resigned from Bloomington Urologi­cal, and in August 1996, Bloomington Urological filed a complaint for declaratory judgment and motions for injunctive relief and a tem­po­rary re­strain­ing order (TRO) arising from Bloomington Uro­logical's claim that Scaglia was violating the covenant not to compete.  The trial court en­tered a TRO, and in Au­gust 1996, the court denied Scaglia's mo­tion to dissolve it.  On Sep­tember 6, 1996 (prior to the hear­ing on Bloomington Urological's request for injunctive relief), the par­ties reached an agree­ment, and the court entered an agreed order.  The agreed order provided, in relevant part, that Scaglia "shall not be involved in the busi­ness of providing urological medicine services within a 50-mile radius of Bloomington, Illinois, from this date until June 30, 1997."  The agreed order also dis­missed the un­der­lying complaint with­out preju­dice to the right of either party to pursue a cause of ac­tion arising from breach of the employment contract or vio­la­tion of the agreed order.  

In October 1996, Bloomington Urological filed a mo­tion for an order to show cause why Scaglia should not be found in vio­la­tion of the agreed order, together with a motion that the trial court rein­state the underlying cause dis­missed pursuant to the agreed or­der.  At the October and December 1996 hearings on the mo­tion, the evidence showed the fol­low­ing.  Scaglia testified that his medical office is located in a time-share office in Ottawa, Illinois, and is staffed Monday and Tuesday mornings, and all day on Thurs­day.  On Wednes­days and Fri­days, at least one nurse works out of Scaglia's home in Bloomington, Illinois.  While work­ing at his home, Scaglia's nurses (1) organize and prepare pa­tients' charts, (2) check on patients' sta­tus and labo­ratory work, (3) "check on sched­uling of pa­tients for surgi­cal proce­dures," (4) perform other cler­ical work, such as typing let­ters, and (5) sometimes call in prescrip­tions after consulting with him.   

Scaglia's home of­fice has two telephone lines and a fax line listed under "Bennett Scaglia, M.D.," and calls to the Otta­wa of­fice are automatically forwarded to his home office when the Otta­wa of­fice is not staffed.  Most of his medi­cal prac­tice-re­lat­ed mail comes to his home of­fice.  Scaglia stat­ed that he is rare­ly at his home of­fice.  He occasional­ly re­ceives phone calls at home from existing pa­tients who have treatment-related ques­tions, and he some­times calls in pre­scrip­tions from his home.  Scaglia further stated that he does not have an exami­na­tion room in his home office, and he has never seen a patient at his home for "hands-on medical care" or any other kind of meet­ing.

Scaglia's wife, Rose, tes­ti­fied that Scaglia main­tained an of­fice in their home "as a central answering service."  She also stat­ed that vari­ous pa­tient records were transmitted over the home fax line, and the billing for Scaglia's practice is handled from the home of­fice.  

Scaglia's nurses testified that while working at his home office, they scheduled surgery and outpatient procedures, handled billing, and talked with current patients about their medi­ca­tions.

At the conclusion of the hearing, the trial court found that Scaglia vio­lat­ed para­graph 1 of the agreed or­der that pro­vided that he "shall not be in­volved in the busi­ness of pro­vid­ing uro­log­i­cal medicine servic­es within a 50-mile radius of Bloomington, Illi­nois, from this date until June 30, 1997."  The court subsequently en­tered a writ­ten order find­ing Scaglia in indi­rect civil con­tempt of court for vio­lating para­graph 1 of the agreed or­der.     

II. ANALYSIS

Initially, we address this court's entry of a rule to show cause why the ap­peal should not be dis­missed for lack of an appealable order.  In his response to the rule to show cause, Scaglia contends that this court has jurisdiction to consider the trial court's order under Supreme Court Rule 307(a)(1), which permits interlocutory appeal from injunctive orders.  166 Ill. 2d R. 307(a)(1).  We agree.  

In determining whether a trial court's order is appeal­able under Rule 307, this court must look to the substance, not the form, of the court's order.  
Bohn Aluminum & Brass Co. v. Bark­er
, 55 Ill. 2d 177, 180, 303 N.E.2d 1, 3 (1973); 
In re Estate of Ohlman
, 259 Ill. App. 3d 120, 130, 630 N.E.2d 1133, 1141 (1994).  An order constitutes an appealable injunction if it requires a person "'to do a particular thing, or to refrain from doing a particular thing, ac­cording to the exigency of the writ, the most common sort of which operate as a restraint upon the party in the exercise of his real or supposed rights.'"  
In re A Minor
, 127 Ill. 2d 247, 261, 537 N.E.2d 292, 298 (1989), quoting 
Wangelin v. Goe
, 50 Ill. 459, 463 (1869).  Further, in 
In re A Minor
 (127 Ill. 2d at 261, 537 N.E.2d at 297) the supreme court wrote that there exists "a policy of broadly construing the mean­ing of the term 'injunction.'"     

Af­ter con­duct­ing hear­ings on the rule to show cause, the trial court found Scaglia in indi­rect civil con­tempt for vio­lat­ing the agreed or­der, or­dered that he not be involved in the business of providing urological medicine with­in the re­stricted area through June 30, 1997, and ordered that he desist from cer­tain con­duct with­in the re­stricted area through June 30, 1997--name­ly, that he (1) "shall keep no files relating to pa­tients within 50 miles of Bloomington, Illi­nois," (2) "shall have no in person or telephone contact with any pa­tient if Dr. Scaglia is physical­ly within 50 miles of Bloomington, Illinois," (3) "shall maintain no medical practice and shall employ no staff within 50 miles of Bloomington, Illi­nois," and (4) "shall not have an of­fice in Bloomington, Illinois[,] and shall have no office tele­phone, fax or address within 50 miles of Bloomington, Illi­nois."  The court's order here required Scaglia to refrain from doing several "par­ticular" things, and it operated as a restraint on his right to provide uroligical medical services to his existing pa­tients.  Thus, we conclude that the court's order is appealable under Rule 307(a)(1).  We further conclude that Bloomington Urological's fil­ing (after Scaglia filed his no­tice of ap­peal) of a postjudg­ment motion seek­ing modi­fica­tion of the court's order did not ren­der the court's order nonappeal­able until such time as the motion was resolved.  In 
Trophytime, Inc. v. Gra­ham
, 73 Ill. App. 3d 335, 335-36, 391 N.E.2d 1074, 1074-75 (1979), this court held that no mo­tion at­tacking an inter­locutory order ap­pealable under Rule 307 serves to extend the time for taking an ap­peal.  Al­though the situation here is somewhat dif­ferent from that in 
Trophytime
 (where the party who filed the postjudgment motion also filed the notice of appeal), we none­theless hold that Bloomington Urological's fil­ing of a postjudg­ment motion does not serve to postpone Scaglia's time for taking an appeal.   

A. The Trial Court's Finding of Contempt

Scaglia argues that the trial court erred by finding him in indirect civil contempt because the agreed order upon which the contempt finding was based was ambiguous and did not clearly set forth what acts were prohibited.  In response, Bloomington Urological argues that paragraph 1 of the agreed order is unam­biguous and prohibits Scaglia from being "in­volved in the busi­ness of pro­vid­ing uro­log­i­cal medicine ser­vic­es," as opposed to being involved in the "'practice' of urologic medi­cine."  We agree with Scaglia that the language of paragraph 1 of the agreed order is ambiguous in its scope.

An agreed order is considered a contract between the parties to the litigation.  Thus, its construction is governed by principles of contract law.  
Elliot v. LRSL Enterprises, Inc.
, 226 Ill. App. 3d 724, 728-29, 589 N.E.2d 1074, 1077 (1992).  As with any other contract, "[w]hether a restrictive covenant is am­biguous is a question of law."  
Fick v. Weedon
, 244 Ill. App. 3d 413, 416, 613 N.E.2d 362, 364 (1993).
  Thus, we in­ter­pret the agreed order at issue here 
de
 
novo
.  See 
Stojkovich v. Monadnock Build­ing
, 281 Ill. App. 3d 733, 742, 666 N.E.2d 704, 711 (1996) (when an issue is de­cid­ed as a mat­ter of law, re­view of a trial court's decision on the matter is gen­eral­ly 
de
 
novo
).  

The pri­ma­ry con­sid­er­ation in in­ter­pret­ing an agreed order is to ef­fectu­ate the parties' in­tent.  
Elliot
, 226 Ill. App. 3d at 729, 589 N.E.2d at 1077.  In 
Martindell v. Lake Shore National Bank
, 15 Ill. 2d 272, 283, 154 N.E.2d 683, 689 (1958), the su­preme court wrote as fol­lows:

"In general, the intention of the parties is to be determined from the final agreement exe­cuted by them, rather than from prelimi­nary negotiations and agreements, [citation] but previous agreements, negotiations and circum­stances may be considered in determin­ing the meaning of specific words and claus­es."

Accordingly, an agreed order must be interpreted in its entirety, considering all facts and circumstances surrounding its execu­tion, as well as pleadings and motions from which it emanates.  
Elliot
, 226 Ill. App. 3d at 729, 589 N.E.2d at 1077.  Further, where--as here--an agreed order emanates from a restrictive cove­nant, the court must strictly con­strue it and resolve any doubts or ambiguities in favor of natu­ral rights and against re­stric­tion.  
Lempka v. Finkel
, 278 Ill. App. 3d 417, 427-28, 663 N.E.2d 158, 166 (1996).     

Here, sec­tion 5.2(d) of the em­ploy­ment agree­ment pro­vid­ed that upon termi­nation of his em­ploy­ment, Scaglia would not "en­gage in the [b]usi­ness" from any office locat­ed with­in a 50-mile radius of any Bloomington Uro­logi­cal of­fice for a 12-month peri­od.  Section I.A. of the em­ployment agreement defined "the '[b]usiness'" as "the provision of medical services."  Thus, the employment agree­ment--from which the agreed order flowed--provid­ed that Scaglia would not en­gage in the pro­vi­sion of medi­cal servic­es.  Count II of Bloomington Urological's com­plaint (breach of con­tract) al­leged that Scaglia was "engaged in the business with­in a 50-mile radi­us" of a Bloomington Urolog­ical office.  At the hear­ing on Bloomington Urological's motion for a TRO, Scaglia's at­torney referred to Scaglia's being "enjoined from prac­ticing medi­cine."  In addi­tion, at the October 1996 hear­ing, Bloomington Urolog­ical discussed what "the parties thought it meant not to be in the business of providing urologi­cal medi­cine" and suggested that it involved "treating" pa­tients.  Fur­ther, the lan­guage of para­graph 1 of the agreed order is clearly capa­ble of being un­der­stood in more than one sense.

Thus, strictly con­struing the agreed order, resolving any ambiguities against restriction, and con­sidering the circum­stances sur­round­ing its exe­cu­tion--as well as the em­ploy­ment agreement and com­plaint from which it ema­nated--we con­clude that paragraph 1 of the agreed order prohibited Scaglia from being involved in the 
practice
 
of
 
medicine
.

 We agree with Scaglia that the practice of medicine does not include administrative or managerial aspects of a medi­cal practice, such as billing, scheduling, and updating pa­tients' charts.  See 225 ILCS 60/49 (West 1994) (stat­ute re­lat­ing to the unau­tho­rized practice of medicine de­scribes the "prac­tice of medi­cine" as the diag­nosis and treat­ment of ailments or condi­tions); see also 
Women's Medi­cal Center v. Finley
, 192 N.J. Su­per. 44, 57, 469 A.2d 65, 73 (1983) (busi­ness, ad­min­is­tra­tive, and manage­ment tasks--whether per­formed in-house or outsourced--have "no fun­damen­tal impact on the 'modality' of deliv­ery of health care servic­es"); 
Practice Man­agement Asso­ci­ates, Inc. v. Orman
, 614 So. 2d 1135, 1138 (Fla. Dist. App. 1993) (under Illi­nois law, a physi­cian may split fees with a nonprofes­sional who pro­vides marketing servic­es).  

Fur­ther, al­though we do not de­cide pre­cise­ly what "the prac­tice of medi­cine" means in the con­text of a re­stric­tive cove­nant, we conclude that, in this con­text, it 
can­not
 in­clude tele­phone in­qui­ries from ex­isting pa­tients to a physi­cian (or his employees acting as conduits of information) or re­spons­es to those pa­tients--ei­ther in the form of recom­mending treat­ment or pre­scrib­ing medi­cation.  In the age of mod­ern tech­nolo­gy--where tele­phones and beep­ers travel with an indi­vidu­al and tele­phone calls can be automat­ical­ly for­warded to another line--it simply makes no sense to place significance upon 
where a physician hap­pens to take phone calls.  

In addition, physicians have both a legal and ethi­cal obligation to attend to their patients' needs.  Phy­si­cians li­censed in Illi­nois are spe­cif­i­cal­ly pro­hib­it­ed from aban­don­ing their pa­tients.  See 225 ILCS 60/22(A)(16) (West 1994).  Further, the American Medical Association's Council on Ethical and Judi­cial Affairs mandates that "once having under­tak­en a case, the physi­cian should not neglect the patient."  Ameri­can Medical Associa­tion Code of Medi­cal Ethics:  Current Opinions with Anno­tations, 8.11 (1996).  To con­clude that tele­phone inqui­ries from existing pa­tients to their phy­si­cian consti­tute the practice of medicine in the context of a restrictive covenant would ef­fec­tive­ly force a phy­si­cian to ne­glect or aban­don his patients when­ever they tele­phone or page him with medi­cal-relat­ed ques­tions, concerns, or emergen­cies at a time when he hap­pens to be in the restricted geo­graph­ic­al area. 

So construed, we conclude that Scaglia did not violate the agreed or­der.  That order permitted him to examine, diag­nose, and treat pa­tients in his Otta­wa of­fice, and it is undis­puted that he never personally examined a patient in his home of­fice.  Nor did the evidence show that he or his nurses ever so­licited patients from his home of­fice.  Scaglia's re­sponse--and his nurs­es' responses--to tele­phone calls from pa­tients he had al­ready per­sonal­ly seen and treat­ed in Otta­wa is a neces­sary con­comitant to his treatment of those pa­tients.

Thus, under the circumstances of this case, the trial court erred by finding Scaglia in indirect civil contempt.  See  
In re Mar­riage of Herkert
, 245 Ill. App. 3d 1068, 1073, 615 N.E.2d 833, 836-37 (1993) (a trial court's find­ing of con­tempt will not be re­versed un­less it is against the mani­fest weight of the evi­dence).   

Because we so conclude, we need not address Scaglia's argu­ment that the trial court erred by altering the terms of the agreed order. 

III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment. 

Reversed.

COOK, J., concurs.

McCULLOUGH, J., dissents.

McCULLOUGH, J., dissenting,

Because I disagree with the majority's conclusion that the agreed order is ambiguous in the scope of the acts prohibit­ed, I respectfully dissent.

Illinois public policy strongly favors freedom of con­tract, and courts will not declare a contract viola­tive of public policy unless it expressly contravenes the law or a known public policy of this state.  
Schniederjon v. Krupa
, 130 Ill. App. 3d 656, 659, 474 N.E.2d 805, 808 (1985).  In up­holding the validity of a restriction by contract upon the right to prac­tice medicine, the supreme court in 
Canfield v. Spear
, 44 Ill. 2d 49, 52, 254 N.E.2d 433, 435 (1969), found that no le­giti­mate public in­terest is ad­verse­ly affected by such contract, inas­much as the doc­tor could prac­tice elsewhere and other doctors would move their prac­tice to the area to alleviate any shortage.  The parties here were free to draft any provisions they liked for pur­pos­es of re­solv­ing their dispute by means of the agreed order.  Had they wished mere­ly to pro­hibit Scaglia from the "practice of medi­cine," a concept the majority itself declines to define, they might readi­ly have done so.  In­stead, the agreed order prohibited Scaglia from being "involved in the business of providing urolog­ical medicine ser­vices," a limitation necessarily broader than the "practice of medicine."

The trial court found the following violations proved beyond a reasonable doubt:

(1) "[Scaglia] is listed in the phone book, the Bloomington phone book, as Urologic Sur­gery Associates."

(2) Scaglia is also personally separate­ly listed in the same book as "Dr. Bennett Scaglia."

(3) He employs two registered nurses who work out of his home.

(4) Scaglia's wife, when she changed ad­dress with the Bloomington Post Office "indi­cated it was a business, Urologic Sur­gery Associ­ates, moved from 1505 Eastland Drive, Bloomington, to 3206 Viney Lane, Bloomington."

(5) Scheduling of work was performed at the office.  Nurse Nydegger indicated she did reception work for Scaglia 50% in Bloomington and 50% in Ottawa.

(6) Patient files are kept in Bloomington.  Prescription forms are mailed from the Bloomington office.

Pro­visions of the Medical Practice Act of 1987 relating to the unau­tho­rized practice of medicine de­scribe the prac­tice of medi­cine as the "diag­nosis or treatment of physical or mental ail­ments" (225 ILCS 60/49(i) (West 1994)), and also in­clude con­duct of a person who "attaches the title Doctor, Physi­cian, Sur­geon, [or] M.D. *** to his or her name indi­cating that he or she is en­gaged in the treatment of human ail­ments or condi­tions as a busi­ness."  225 ILCS 60/49(v) (West 1994).  The trial judge could rea­son­ably find that defendant's mainte­nance of a tele­phone list­ing in his profes­sion­al capacity consti­tuted providing uro­logical medicine services and, there­fore, the pro­vi­sion of medi­cal ser­vic­es within the restricted area.  Pa­tient charts and files are necessarily inte­gral to the diagno­sis and treatment of pa­tients, and the mainte­nance of files in the Bloom­ington home office could also reason­ably be found to consti­tute the "business of providing urological medicine services."  Simi­lar­ly, de­fen­dant em­ploys two nurs­es in the Bloomington home of­fice who oper­ate under his di­rection and con­trol and act as a conduit for defendant's pre­scription of medica­tion and other medical treat­ment.  De­fen­dant personally provided medical advice and pre­scribed treatment from the Bloomington home office in re­sponse to pa­tient calls to that location.  Apply­ing the manifest weight standard, it is clear defen­dant violated the agreed order.

The parties bargained for the restriction of "being involved in the business of providing urological medicine servic­es."  That Scaglia would pay that agreement only cur­so­ry heed, by lim­it­ing his physical contact with pa­tients to the Otta­wa office, evidenc­es his disdain for the broad­er reach of the agree­ment he volun­tari­ly entered into.  The majority's constriction of the agreed order to the pro­hi­bi­tion of face-to-face, physician-pa­tient contact, is not supported by the language the parties chose in framing their consen­sus.

Curiously, the majority does not contend a restriction on the practice of medicine, a course of conduct it agrees in­volves the diagnosis and treatment of physical ailment, is against pub­lic poli­cy--but it becomes so when there is a restric­tion on doc­tor-pa­tient tele­phon­ic contract for that same purpose.   The trial court's finding of contempt for violation of the agreed order was not against the manifest weight of the evi­dence.  I dissent.