*In re* MARRIAGE OF STEVE HERKERT, Petitioner-Appellant, and LISA L. HERKERT, n/k/a Lisa L. Fitzpatrick, Respondent-Appellee.

Fourth District    No. 4—92—0832

Opinion filed June 17, 1993.

Bob L. Perica, of Hoefert & Perica, P.C., of Alton, for appellant.

John W. Guntren, of Jerseyville, for appellee.

JUSTICE LUND delivered the opinion of the court:

Petitioner Steve Herkert appeals an order of the circuit court of Jersey County granting a motion for court approval to remove minor children from Illinois, under section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 609(a)). He also appeals the trial court's denial of his petition for rule to show cause, requesting the court to hold his ex-wife in contempt for her failure to allow petitioner visitation with his two children. We affirm.

Steve Herkert and Lisa Herkert (now Fitzpatrick) were divorced for the second time on December 11, 1990. They received joint custody of their children, Stephanie (born March 28, 1979) and Christine (born January 6, 1981), with primary custody awarded to Lisa. The dissolution proceedings have been highly antagonistic, with repeated court appearances to enforce particular provisions of the agreement. The parties came to the conclusion that the two children, Stephanie and Christine, were adversely affected by this continuing litigation. As a result, on December 20, 1991, both parties signed an agreement to withdraw all pending motions and resolve future disputes within the terms of the joint-parenting agreement previously entered.

During the hearing in the case at hand, both parties were required to limit testimony to events occurring after this agreement had been signed. The intent was to avoid, to the extent possible, relitigating past behavior of the parties that gave rise to the various disputes. Also as a result of this agreement, a psychologist's evaluation of the family, ordered prior to December 20, 1991, was not considered in these proceedings. However, the psychologist who prepared this re-

port was called as a witness and her testimony admitted. Facts are as follows.

Lisa had remarried and lived in Jerseyville, Illinois, with her husband, Paul Fitzpatrick. In addition to the Herkert children, they also support a six-year-old girl and a nine-week-old infant. Lisa has been on furlough from her job as a flight attendant with Trans World Airlines (TWA) and is currently unemployed. Her new husband has been searching for a year and has been unable to find full-time employment in the Jerseyville area. He is currently working part-time as a bartender. Lisa estimates they are $12,000 in debt (not including accumulated attorney fees), and her husband testified that his current income is insufficient to meet family expenses.

· Lisa was recently recalled to TWA and, in order to avoid falling even further into debt, Lisa·requested she be allowed to move the family to Plainview, New York. If allowed to live in New York, she could resume her position with TWA and be assigned "turnarounds," round-trip flights that would allow her to return home each night after work to care for her children. Her only alternative is to resume work in St. Louis, where her lack of seniority would force her to be· away from home as much as 20 days out of each month.

Her husband, Paul, currently worked as a bartender, making approximately $200 per week. He received no health or other insurance benefits. His parents had agreed to allow him to move his family into their home in Plainview, New York, where they could live at almost no cost. Furthermore, his father had told him he had a job waiting for him with the Treasurer's and Ticket Seller's Union, paying $24 per hour and offering some benefits. The home has a finished basement which includes two bedrooms, a large living room area, and a large area for another bedroom. They would have their own bathroom and full use of the upstairs of the house. Paul's mother currently worked part-time, but she would be leaving this position to care for the newborn while Lisa is at work.

Steve contends that he would lose his father-daughter bond if the children were allowed to be removed to New York. Steve testified that he loves and cherishes his children, saying they mean everything to him. Unfortunately, both his daughters are currently estranged from their father. At an *in camera* hearing, the girls testified they would rather not participate in court-ordered visitation with their father. Prior visitations had resulted in Steve losing his temper, yelling and screaming at the children about how he was going to take their mother back to court and how this time he was going to win. The children were seeing him every other weekend, and this behavior oc-

curred almost every time. Sometimes he would have the children sit down to read articles about men's rights that he had collected from magazines and newspapers. Afterward, he would talk to them about how he was going to win in court. Both children described his attitude during these spells as violent in nature. He told the children that their mother was in contempt, which led the girls to believe that their mother would go to jail.

When asked how she felt about her dad, Christine responded that she was "kind of mad at him, because *** he wants to just have revenge on mom because she remarried." Stephanie was asked if she might change her mind about her father if he promised not to raise his voice and talk about divorce matters. She replied that she doubted he would be able to do that.

Stephanie was asked whether her father had done anything to make them afraid, other than raising his voice. She responded he had disciplined them a few years ago by knocking their heads together. On another occasion, he allegedly disciplined Christine on the rear with a razor strap. They also described an occasion when he scared Christine about how easily she could catch the "AIDS" virus. Christine mentioned that if her father drinks, he gets violent. She also mentioned that she was afraid she would get in trouble if she called her mother on the telephone during visitation with her father.

In describing their relationship to their father, the girls told of an incident prior to the divorce where, in the midst of an argument with Lisa, he told Stephanie she might not really be his daughter. He apparently kept asking the girls to pick which parent they wanted to live with, saying he would respect their answer. He then asked which parent they loved the most. They both picked their mother and he apparently replied he did not care what they said, he would still fight for them.

The children both testified they would like to move to New York. They visited Plainview on two prior occasions and described the town as similar to Jerseyville. They said there was a lot to do in Plainview and they thought it would be fun. When asked about the friends she would leave behind, Stephanie said she would miss them but was unconcerned because she would be able to see them every summer during visitation. When asked how they felt about not seeing their father as often, both children replied that it would be okay. Both girls were aware of the fact that they might not be able to change their minds after they moved. The trial court observed that both children are articulate and mature beyond their years. They clearly stated their desire to move to New York.

In October 1991 (prior to the December 20, 1991, agreement), Steve called the girls to discuss visitation. When Christine told him she did not want to go, he allegedly began yelling at her until she was reduced to tears. He demanded to speak with Stephanie, but she refused to come to the phone because she was too upset. Steve allegedly told Christine he was going to have the police come after her. (The record is unclear as to whether this last statement occurred during the same phone conversation.)

On advice from his family counselor, Sherry Kalicak, Steve decided to let the girls decide on their own whether they wanted visitation with him. Each time weekend visitation approached, the girls sent their father a letter telling him they did not want to see him. Steve responded with letters to the girls, telling them how much he loved and missed them. Lisa testified she always told her daughters they should love their father and had never discouraged them from seeing him. She explained to them that it was their decision whether to see their father. Both girls corroborated this testimony.

By this time, the relationship between Steve and Lisa had deteriorated to a point where Steve refused to speak with her on the telephone. When she tried to call, he would tell her that her calls were being taped and then he would hang up. Every week Steve would allegedly send her a letter threatening to try the matter as a criminal case.

After the December 20, 1991, agreement, Lisa was still under the impression that the girls would not be forced to go on visitation against their will. According to the agreement, Steve was to have visitation for Christmas. Lisa mailed a letter to Steve, explaining the girls still did not wish to see him and gave a phone number where they could be reached at Paul's parents' home in New York. Steve was upset because he thought the December 20, 1991, agreement had cleared up the visitation problems. He sent a letter to Lisa on December 27, 1991, stating he would be exercising all visitation rights from that point forward. Unable to locate her own attorney, Lisa spoke with the State's Attorney, who gave her the impression that she need not send the girls against their will. Consequently, Steve was deprived of his scheduled visitation on January 1 and 6, 1992; weekend visitations of January 3, 17, 31, and February 8, 1992, were also missed.

Lisa's failure to provide visitation on these dates forms the basis of Steve's motion requesting the court hold her in contempt. The trial court found that while Lisa could have done more to encourage or require the children to visit their father, the evidence did not indicate she willfully violated Steve's rights. During the hearing it

was repeatedly made clear to Lisa that from this point forward, the children would be required to participate in visitation regardless of their personal feelings. Lisa agreed to cooperate. According to Lisa's brief, make-up visitation has accounted for all but one weekend and the Christmas Day visitation previously missed.

Whether, and on what grounds, a party is guilty of contempt rests within the sole discretion of the trial court. Such discretion will not be reversed unless it has been abused or is against the manifest weight of the evidence. (*In re Marriage of Betts* (1989), 190 Ill. App. 3d 961, 965, 547 N.E.2d 686, 689.) We find no abuse of discretion and will not disturb the trial court's refusal to find Lisa in contempt.

In removal cases, the paramount question is whether the move is in the best interest of the child. The burden of proof is on the custodial parent. (Ill. Rev. Stat. 1991, ch. 40, par. 609(a).) Each case must be judged on its own unique set of facts. (*In re Marriage of Davis* (1992), 229 Ill. App. 3d 653, 594 N.E.2d 734.) Our supreme court identified five factors to consider in determining whether removal is in the child's best interest: (1) the likelihood for enhancing the general quality of life for both the custodial parent and the children; (2) the motives of the custodial parent in seeking the move; (3) the motives of the noncustodial parent in resisting the move; (4) the visitation rights of the noncustodial parent; and (5) whether a realistic and reasonable visitation schedule can be reached if the move is allowed. (*In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 326-27, 518 N.E.2d 1041, 1045-46.) In addition, the court should be guided by the policy of the Act, as expressed in section 102(7), to "secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation." Ill. Rev. Stat. 1991, ch. 40, par. 102(7).

■ In regard to the first factor, we find that the proposed move will likely enhance the general quality of life for both the custodial parent and the children. Despite a sincere effort to find employment in the area, the trial court found that respondent and her family have endured an extended period of unemployment or underemployment. The family is heavily in debt, and this debt is almost certain to increase if they are forced to remain in the area. Steve contends that evidence of their new jobs in New York is lacking. We disagree. The trial court had the opportunity to view Lisa's documentation proving she had been recalled to TWA and it also carefully questioned Paul regarding his expectation of a job through his father. The trial court found this evidence both credible and convincing, and no evidence was presented that would cast doubt on this conclusion.

Evidence of the quality of housing in New York is lacking. Steve would have us believe that Lisa and Paul's family of six would exchange a spacious home in Illinois for cramped quarters in the basement of a New York home. Paul testified that the finished basement has sufficient bedroom space for the parents and children, its own private bathroom, and they would have full use of the remainder of a spacious house. Again, we have no evidence to refute Lisa and Paul's claim. Perhaps the most significant fact is that the present home is rented, whereas the home in New York would be rent free.

No evidence was presented regarding the quality of the schools in New York, nor was there any evidence that these schools would be unsatisfactory. Steve contends that the children would receive a better education in Jerseyville, but offers no support for this contention. As a child, Paul attended the same schools that Stephanie and Christine would attend in New York.

Another reason Steve opposes the move is his feeling that Stephanie has problems adapting to different situations. He was also disappointed that the children would forfeit their relationship with their extended family here in Illinois. This family includes their grandparents, plus two aunts and uncles on Steve's side of the family. In New York, their only extended family would be relatives of Paul.

Perhaps the most significant factor in considering whether the move will enhance the lives of the children is the issue of family counseling. Kalicak, a clinical psychologist with the Macoupin County Mental Health Center, interviewed each member of the family and found that the children had developed a fear of discussing the problems they were having with their father. Kalicak testified:

"[B]ecause they seem to have such a reluctance and an avoidance of being able to even talk with their father, it would make me believe that they will be having some difficulties later on if they are not able *** to communicate and to resolve these issues with him."

Kalicak concluded that the girls need to be in counseling with their father and, although sporadic counseling is not very effective, it is better than none at all.

The trial court fully recognized the importance of mending the relationship between the father and his daughters. Acknowledging that the distance between the parties will make counseling more difficult, the court ordered that some type counseling should take place during every visitation period in excess of three days. This counseling is to continue until the issues are resolved in the judgment of the counselor. Furthermore, both parties were ordered to obtain individual

counseling, with the goal of improving communications between them and reducing misunderstandings and conflict.

A determination of the best interests of the child cannot be reduced to a simple bright-line test. (*Eckert*, 119 Ill. 2d at 326, 518 N.E.2d at 1045.) The trial court faced a significant challenge in weighing the various factors in this case. Both children clearly stated their desire to move and articulated their reasons for wanting to do so. They were aware of the fact that their family was falling behind in its bills and that the move would increase their standard of living. These factors are balanced against the need for these children to restore their relationship with their father.

In contrast to the case at hand, the *Eckert* decision involved a custodial parent who claimed in her removal petition that the move would enhance her salary and improve the child's health. Both claims were found to be unsupported. Furthermore, the noncustodial parent enjoyed an exceptionally close relationship to the child. On these facts, the supreme court had little difficulty affirming the trial court's denial of the removal petition. The facts in the case at hand are not nearly so clear-cut. Accordingly, we cannot say that the trial court's conclusion was clearly against the manifest weight of the evidence.

The second and third factors outlined in *Eckert* deal with the motives of the custodial parent in requesting the move and the noncustodial parent in resisting it. The trial court found no reason to suspect the motives of either parent. Lisa's desire to move to New York appears to be based upon sound financial considerations combined with the necessity of caring for her newborn child, as well as the children at issue in this case. Steve emphasizes that the petition for removal was filed as a response to his own petition to have Lisa cited for contempt. Lisa's past actions, he argues, provide ample proof that her only motive is to frustrate his visitation privileges and substitute her new husband as the father of Christine and Stephanie. We disagree. The visitation problems appear to be intimately connected to Steve's own role in the deterioration of his relationship with his daughters. Evidence of Lisa's severe financial difficulties demonstrates that the proposed move is more than a mere ruse intended to defeat Steve's visitation rights.

The fourth and fifth factors to consider are the visitation rights of the noncustodial parent and whether a realistic and reasonable visitation schedule can be reached if the move is allowed. Under the joint-parenting agreement originally entered, Steve would have visitation every other weekend plus alternate Federal holidays, totaling seven days each year. He was also entitled to visitation for a total of four

weeks every summer. Under the order granting removal, Steve will be entitled to summer visitation from one week after school is out until 10 days before school begins. Lisa will be entitled to a single four-day visitation period within the State of Illinois during this summer visitation. Steve would also have visitation for one week during alternate Christmas and spring vacations, and also for alternate Thanksgiving vacations. Transportation costs for these visitation periods will be borne by Lisa.

Under the new plan, Steve is entitled to visit the children in New York at any time for a period up to four days. Furthermore, he may request weekend vacation in Illinois so long as the requests do not exceed one weekend per month. Steve will be required to pay the transportation costs of these visits, but Lisa has agreed to cooperate in making inexpensive flight arrangements for the children through her employer, TWA.

Steve contends that the visitation schedule represents a drastic reduction from the terms of the original joint custody order. Without specific dates regarding the school term, we have no way of computing the difference in the actual number of days under the two orders. Clearly, Steve's visitation over the summer months will be extended in comparison to the prior scheme, but at the cost of giving up his regular visitation every other weekend. Although the new scheme appears to reduce Steve's visitation rights, the total number of days spent with the children could easily increase over the original scheme, depending upon how often Steve visits New York or has the children visit him in Illinois. Steve contends he could never afford to visit the children in New York on a frequent basis. However, the trial court heard testimony that the children would be able to fly to Illinois at nearly no cost, as a result of Lisa's employment.

Our supreme court has ruled that a reasonable visitation schedule is one that will preserve and foster the child's relationship with the noncustodial parent. When a parent has assiduously exercised his visitation rights, a court should be loath to interfere with it by permitting removal of the children for frivolous, unpersuasive, or inadequate reasons. (*Eckert*, 119 Ill. 2d at 327, 518 N.E.2d at 1046.) In the case before us, we have a father who has diligently exercised his visitation rights and clearly cherishes his attachment to his children, even though his comments to the children during visitation were at times improper and unwise. However, the reasons for seeking the move to New York are neither frivolous nor inadequate.

We are mindful of the fact that the actual number of days spent with the noncustodial parent can be, at times, less relevant than the

interval between visits. This is especially significant in the case at hand, where professional counseling is an essential element in solving various emotional problems resulting from these proceedings. The fact that the children's estrangement from their father is due to his own behavior, while certainly relevant, is not determinative. The ability to assign blame to one parent or another does little to resolve the issue of securing the maximum involvement and cooperation of both parents in the emotional well-being of the children.

If the custodial parent establishes a good, sincere reason for wanting to move to another jurisdiction, the trial court should consider all relevant factors in determining the best interest of the child. This determination should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. (*Eckert,* 119 Ill. 2d at 328, 518 N.E.2d at 1046.) We find the trial court's order to be supported by the evidence and no manifest injustice has occurred.

Affirmed.

STEIGMANN, P.J., and KNECHT, J., concur.