KRISTY LEE FARNSWORTH, APPELLEE, V.
JEFFREY D. FARNSWORTH, APPELLANT.
576 N.W. 2d 476

Filed March 3, 1998.   No. A-97-159.

Matthew Stuart Higgins, of Cohen, Vacanti & Higgins, for appellant.

Charles O. Forrest, of Schmid, Mooney & Frederick, P.C., for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and IRWIN, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Jeffrey D. Farnsworth (Jeff) appeals a January 13, 1997, order of the district court for Douglas County modifying a decree that dissolved his marriage to Kristy Lee Farnsworth. In the January 13 order, the district court allowed Kristy to relocate to Denver, Colorado, with the parties' only child, Casey Jay, born August 21, 1991. The district court also increased Jeff's child support obligation to $525 per month in accordance with the current Nebraska Child Support Guidelines and ordered increased visitation rights for Jeff. Regarding travel expenses, the parties were ordered to split them for the extended summer, Christmas, and Easter break or spring vacation visits and Jeff was ordered to pay the expenses for all other visitations.

The overriding issue in this appeal is whether a divorced mother who has custody of her son, now 6 years of age, has shown that she has a legitimate reason that is in the son's best interests to move him more than 500 miles from his father, who, by everyone's account, spends approximately one-half of the

year exercising visitation with his son. On the record presented in this case, we conclude that the mother has not proved a legitimate reason for leaving the state and that the trial court abused its discretion in allowing her to do so.

## II. FACTUAL BACKGROUND

Pursuant to the original divorce decree entered May 31, 1995, Kristy was awarded custody of Casey subject to Jeff's visitation rights, which included visitation of 1 week commencing on Monday of the second full week of each month, visitation every other weekend from Friday at 6 p.m. through Sunday at 6 p.m., and 6 weeks' extended summer visitation. At the time of the decree, both Kristy and Jeff resided in Nebraska. Jeff was ordered to pay child support of $250 per month. Jeff's support was cut in half for the extended summer vacation.

On July 11, 1996, Kristy filed an application to modify the decree to increase the amount of Jeff's child support in conformity with the current Nebraska Child Support Guidelines. Jeff filed an answer opposing Kristy's application. Jeff also filed a cross-application for modification, seeking an order awarding him and Kristy joint custody of Casey or, in the alternative, specific, increased, and extended visitation with Casey. He also requested that the court prohibit Kristy from leaving the local area with Casey. Thereafter, on October 16, Kristy filed a motion to remove Casey from Nebraska to Denver. Pursuant to the parties' stipulation, Jeff had "extended visitation" with Casey during the pendency of Kristy's removal motion, from November 1 through 25.

A hearing was held on the pending matters on December 13, 1996. The parties stipulated that Kristy is a fit and proper person to have custody of Casey. Jeff withdrew the portion of his cross-application requesting joint custody of Casey. Both Kristy and Jeff testified at the hearing.

During presentation of her case, Kristy testified that she made $24,500 per year at Cari Rental in Omaha. Her job dealt with corporate furniture leasing. She stated that because her career advancement possibilities with Cari Rental were limited due to the size of the company, she began to look for another job. She restricted her search to other *corporate* furniture-

leasing jobs, refusing to consider *office* furniture-leasing jobs because she enjoyed corporate leasing. (The precise distinction between these two types of job is unclear from the record.) Kristy testified about her search for a job in Omaha and said, "I think I looked in the want ads every Sunday; kept my ears open, kept my eyes open. Just looked. I didn't submit a resume or anything like that but I was always aware." On cross-examination, she testified that she never contacted any employment agencies and never sent out any letters of inquiry to prospective employers in Omaha.

Kristy testified that she "put some feelers out" in the Denver area and obtained employment with Cort Furniture Rental, a corporate furniture-rental company. The trial testimony reveals that she accepted a position with Cort prior to the modification hearing. Her starting salary was $24,000 a year "plus commission." She testified that Cort offers better career opportunities. She had also rented a two-bedroom condominium in a Denver suburb prior to the modification hearing. In a candid response during cross-examination, she responded yes to a question eliciting that she was "basically banking on being allowed [by the court] to move to Denver."

Kristy testified that she had begun looking for a job in Denver because she has both family and friends in Denver, including her best friend, her boyfriend of 9 months, and three first cousins. Kristy testified that in comparison, she has few friends in Omaha, and that her family does not live in Omaha, although her parents live approximately 2½ hours away from Omaha. Kristy acknowledged that Casey does have family in Omaha, including his grandparents, one uncle, one aunt, and two cousins. Kristy further testified that she "always wanted to live [in Denver]." This was contradicted by Jeff's testimony. He testified that he had job offers, prior to the parties' estrangement, from businesses in Denver and Dallas; however, Kristy desired to stay in Omaha to "be close to her parents." The parties did not move.

Kristy also testified that there are several parks in the area near the condominium as well as lots of outdoor activities, which Casey enjoys, including skiing, hiking, canoeing, and kayaking, and an amusement park.

Jeff testified that he was opposed to Kristy's application to remove Casey to Colorado because his visitation with his son would be inhibited. He testified that he had never missed any scheduled visitation and corroborated that he spent time with his son throughout the year equal to approximately one-half of all the days in the year. Jeff does not want his son to leave. He stated at the modification hearing, "I want to be a part of my son's life. I want him to be a part of my family's life. I hate to miss out on him starting little league, him starting school, being at the parent-teacher conferences; basically, seeing my son grow up." Jeff's past visitation history bears witness to this statement.

Jeff also testified that Kristy had told him that he had "no rights" and "no say" and that she "gave [him] all the rights [he] had regarding [his son]." Kristy had been asked about this earlier in cross-examination. She had responded, "I don't recall. I — in what — I don't believe I did. I don't think I did." A follow-up question was asked: "Could that be something that you would have said, you have no rights, you have what you're going to get, something to that effect?" Her answer was "No, I don't — please —." A recess was then taken. A tape recording was produced that showed that in fact this disturbing remark was made by Kristy in a phone conversation with Jeff.

Jeff also offered the testimony of Gerry Phaneuf, the director of career services at Creighton University. Phaneuf testified that his experience in the career services field included employment at Creighton University, the University of Nebraska-Lincoln, and Texas Tech University in Lubbock, Texas. His responsibilities have included organizing workshops specifically for women searching for employment. His contacts are not limited to employers searching for persons with college educations. Counsel for Kristy stipulated that Phaneuf is an expert in the area of employment opportunities in Nebraska.

Phaneuf was apparently allowed to be present in the courtroom when Kristy testified regarding her employment and educational history, as well as when she testified that there were no other places in Omaha that could offer her career opportunities similar to those present in Denver. Phaneuf testified as follows

concerning his opinion about Kristy's assertions that similar opportunities are not available in Omaha:

A. In regards to the very specific job title that she has, probably not. I am not — I can't say as of today what sort of specific opportunities are available in the very precise area she was mentioning. But in terms of the type of industry that she is in, there certainly are, in my opinion, far more opportunities that would be very closely related to what she is currently doing.

Q. And, for example, how would the employment opportunities that you have in mind differ from the specific one that she told the Court about in Denver?

A. It could be perhaps the type of product or the — maybe a list of a retail type organization, perhaps a business-to-business organization. It could be a Sheppards Business Interiors or any number of organizations that deal with leasing products and business equipment in Omaha as many, many companies who do that.

Q. Given your experience and education, given the talent and the education that [Kristy] has told the Court about and the things that she does at her new job, are there places in Omaha where she could get a similar employment at a similar pay scale?

A. In my opinion, there would be plenty of opportunities for her, yes.

Q. To your knowledge are there any other places in Omaha that have corporate furniture leasing?

A. Almost any business — professional business environment such as Sheppards or Raders or All Makes, those kinds of organizations have leasing programs, yes, sales and leasing.

. . . .

Q. . . . Did you hear [Kristy] say her base salary would be exactly $25,000 with the hopes of commission of approximately five to six thousand dollars? Regarding the base salary, does that sort of job, do you believe, exist in the Omaha area?

A. Yes, I do.

Q. Okay. How about that commission range, five to six thousand dollars in the first year of work? Would that exist?

. . . .

[A.] The answer is yes.

Phaneuf also testified that the cost of living is higher in Denver than in Omaha.

After hearing the evidence, the district court entered an order granting Kristy leave to remove Casey from Nebraska to Denver, increasing Jeff's support obligation to $525 per month, expanding Jeff's visitation, and ordering that certain travel expenses be equally shared by the parties. Jeff moved that the court reconsider its order. After his motion was denied, Jeff timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

On appeal, Jeff contends that the district court abused its discretion and erred in (1) granting Kristy's application to remove Casey from Nebraska to Denver and (2) failing to find that Jeff's support obligation should be decreased by the reasonable visitation expenses Jeff will incur by driving to Denver to visit Casey.

## IV. ANALYSIS

### 1. GOVERNING PRINCIPLES

The governing propositions of law for this type of case are as follows: The custodial parent has the burden of proving to the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent, before a court will permit the removal of a child from the jurisdiction. *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). The paramount question is whether the move is in the best interests of the child. See *id.* See, also, *Evenson v. Evenson*, 248 Neb. 719, 538 N.W.2d 746 (1995).

### 2. KRISTY'S REASONS FOR MOVE

Kristy's justifications for changing her and Casey's home from Omaha to Denver may be summarized as follows: (1) to obtain employment which pays approximately the same salary as her job in Omaha; (2) because her boyfriend of 9 months

lives in Denver; (3) to give her son the benefit of more outdoor activities, an amusement park, and professional sporting events; and (4) because of a nationally ranked school district in the Denver area.

### (a) Career Opportunities

As indicated above, a custodial parent must first prove to the court there is a legitimate reason for leaving the state. *Harder, supra.* The record does not establish that Kristy's career opportunities in Denver serve as a legitimate reason for this move. The new job Kristy has secured in Denver has no guarantees of paying her more than the amount she received at Cari Rental in Omaha. While she may indeed have been correct in concluding that the career opportunities at Cari Rental were limited, the expert testimony offered by Phaneuf established that opportunities exist in the Omaha area for a person with her skills. Her insistence on wanting to remain in the *corporate* furniture-leasing business borders on capricious. It is obvious from her own testimony that her search for other employment in Omaha was limited at best. We conclude that Kristy did not sufficiently prove that her employment opportunity in Denver was a legitimate reason for her to leave the state.

### (b) Other Reasons for Move

We also conclude that the fact that Kristy's boyfriend of 9 months lives in the Denver area is not a legitimate reason to move the child. This is not a situation, for example, where the custodial parent has remarried and the custodial spouse has had to move because of the new spouse's employment, as in *Harder, supra.* See, *Vanderzee v. Vanderzee,* 221 Neb. 738, 380 N.W.2d 310 (1986); *Gottschall v. Gottschall,* 210 Neb. 679, 316 N.W.2d 610 (1982); *Friedenbach v. Friedenbach,* 204 Neb. 586, 284 N.W.2d 285 (1979) (affirming removal order where custodial parent has remarried and new spouse is employed in another state).

Kristy's assertion that outdoor activities, an amusement park, and professional sporting events in the Denver area serve as a legitimate reason to move fails as well. Given the record before us, were we to conclude otherwise, it would seem that any custodial parent who desires to leave the state merely has to con-

tend that Nebraska really does not offer "the good life." While proximity to the mountains and a large metropolitan city may well be a setting desired by many, it is not sufficient reason to move this son 500 miles away from his father.

Finally, while Kristy testified regarding the schools in the Denver area, no evidence was offered that showed Omaha area public schools are inadequate or that Denver schools are so superior that a move is necessitated by such. The mother failed to carry her burden of establishing a legitimate reason necessitating the removal of this child from his father.

### 3. BEST INTERESTS

■ We also conclude that a move to Denver with his mother is not in this child's best interests. As indicated above, the best interests of the child are the paramount question in cases such as the one before us. See *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). While the Nebraska Supreme Court has not explicitly set forth factors to be considered in removal cases, the following are consistent with Nebraska case law. Factors to be considered in determining whether removal is in a child's best interests should be (1) the likelihood of enhancing the general quality of life for both the custodial parent and the child, (2) the motives of the custodial parent in seeking the move, (3) the motives of the noncustodial parent in resisting the move, (4) the visitation rights of the noncustodial parent, and (5) whether realistic and reasonable visitation schedules can be reached if the move is allowed. See, generally, *Tropea v. Tropea,* 87 N.Y.2d 727, 665 N.E.2d 145, 642 N.Y.S.2d 575 (1996); *Jones v. Jones*, 110 Nev. 1253, 885 P.2d 563 (1994); *In re Marriage of Herkert*, 245 Ill. App. 3d 1068, 615 N.E.2d 833, 186 Ill. Dec. 29 (1993); *Yannas v. Frondistou-Yannas*, 395 Mass. 704, 481 N.E.2d 1153 (1985); *Cooper v. Cooper*, 99 N.J. 42, 491 A.2d 606 (1984), *modified, Holder v. Polanski*, 111 N.J. 344, 544 A.2d 852 (1988).

As discussed above, Kristy has failed to demonstrate that moving to Denver provides an opportunity for an enhanced quality of life because of her alleged employment opportunity. With regard to Kristy's motives for this move, she testified that she "always wanted to live [in Denver]."

Jeff testified in great detail regarding his relationship with Casey and the effect the proposed move would have on this relationship. Clearly, Jeff does not want his son to leave. His past visitation history demonstrates that he treasures his relationship with his son. Jeff spent time with his son throughout the year equal to approximately one-half of all the days in the year. He testified to his reasons for desiring that his son stay in Omaha, as recounted above.

Kristy's remarks that Jeff has "no rights" and "no say" and that she "gave [him] all the rights [he] had regarding [his son]" are disturbing. Such remarks are certainly not indicative of the kind of attitude necessary to foster a long-distance relationship between Casey and Jeff.

It is axiomatic that consideration of the visitation rights of the noncustodial father and whether a realistic and reasonable visitation schedule can be reached if the move is allowed is vital in these cases. The "problem" in this case is that we have a noncustodial parent who spends one-half of the year with his child. Obviously this is going to be impacted when the child moves over 500 miles away. The court's order permitting Kristy to move Casey to Denver deprives Jeff of frequent and continuing contact with his child. The consequence of the trial court's ruling is that Jeff's parenting participation is significantly altered. For him to see Casey during the week is for all practical purposes unrealistic and impossible. The number of weekends that he will be able to see Casey is reduced considerably. Sometimes these consequences are the unalterable effects of divorce. They are not the most desirable effects or the effects that would be achieved in a perfect world. Rather, such disruptive consequences in the lives of parents and the lives of children are just not avoidable. This is not one of those cases.

A reasonable visitation schedule is one that will nurture a child's relationship with the noncustodial parent. When a parent has diligently exercised his visitation rights, a court should not interfere with them by permitting removal of the child for capricious, unconvincing, or deficient reasons. The Nebraska Legislature has indicated its agreement with these principles by the passage in 1993 of Neb. Rev. Stat. § 43-2901 et seq. (Reissue 1993 & Cum. Supp. 1994), the Parenting Act.

In the case before us, we have a father who has exercised his visitation rights without fail and clearly cherishes his attachment to his child. We are not confronted here with the more difficult issue trial judges are called upon to weigh—where a move is demonstrated as necessary due to legitimate reasons and the trial court must resolve whether the benefit to the child in going with the moving parent outweighs the loss or diminution of contact with the nonmoving parent. In this case, we are confronted with a move which has not been demonstrated as necessary or as due to any legitimate reason, and the benefit to the child in going with his mother is outweighed by the loss of contact with his father.

## V. CONCLUSION

Therefore, we reverse that portion of the district court's modification order that allowed Casey's removal to Colorado and that portion of the order that changed the visitation schedule. The order is modified to the extent that we order the prior visitation schedule to be reinstated. We affirm that part of the order as regards child support. We remand the cause for further proceedings consistent with this opinion.

AFFIRMED IN PART, AFFIRMED IN PART AS
MODIFIED, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

MILLER-LERMAN, Chief Judge, dissenting in part.

I respectfully dissent with respect to that portion of the majority's opinion which reverses the trial court's order granting the motion to remove which permitted Kristy to move to Denver with Casey.

The Nebraska Supreme Court has repeatedly stated that an award of custody to a parent should not be interpreted as a sentence of immobilization. *Vanderzee v. Vanderzee*, 221 Neb. 738, 380 N.W.2d 310 (1986). The fact of a denial of visitation rights by removal to another jurisdiction is a fact to be considered in determining the best interests of a child. *Id*. However, neither community ties nor a reduction in visitation necessarily mandates prohibiting a custodial parent from relocating for a legitimate reason. *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). The Nebraska Supreme Court has found that job-related

changes are legitimate reasons where there is a "reasonable expectation of improvement in the career or occupation of the custodial parent," *Gerber v. Gerber*, 225 Neb. 611, 619, 407 N.W.2d 497, 503 (1987), where the custodial parent's new job included a small increase in salary and increased potential for salary advancement, *Jafari v. Jafari*, 204 Neb. 622, 284 N.W.2d 554 (1979), and where the custodial parent's new spouse would earn a base salary of $24,000 plus commissions, *Harder, supra*. Based on Nebraska jurisprudence, which we are bound to apply, I would conclude that the district court properly granted Kristy's motion to remove.