IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

SNODGRASS V. SNODGRASS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LAURA A. SNODGRASS, NOW KNOWN AS LAURA A. TOMCZAK, APPELLANT,
V.
BRYAN S. SNODGRASS, APPELLEE.

Filed October 28, 2014.    No. A-13-917.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Kelly T. Shattuck, of Vacanti Shattuck, for appellant.

John A. Kinney and Jill M. Mason, of Kinney Law, P.C., L.L.O., for appellee.

INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Laura A. Snodgrass, now known as Laura A. Tomczak, appeals from an order of the district court for Douglas County denying her request to remove the parties' minor children to Alabama. The district court found that Laura had a legitimate reason for moving to Alabama (husband's new job); however, it found that the move would not be in the children's best interests. Although we note that preventing a primary custodial parent from moving with her children to live with her new spouse in another state seems harsh, our standard of review only allows this court to reverse in such matters upon finding an abuse of discretion by the trial court. Since we cannot say the district court abused its discretion, we affirm.

## II. BACKGROUND

Laura and Bryan S. Snodgrass were married in December 2003 and were divorced pursuant to a decree of dissolution filed in Gage County District Court in May 2007. Two children were born during the marriage, Elle Snodgrass, born in September 2004, and Evan

- 1 -

Snodgrass, born in April 2006. In the decree, and upon agreement of the parties, the district court awarded custody of Elle and Evan to Laura, subject to Bryan's specific rights to parenting time.

In November 2008, Laura began a relationship with Joshua Tomczak (Joshua). When they began their relationship, Joshua worked at Novartis Consumer Health (Novartis) in Lincoln. Joshua began living with Laura and the children in 2010. Laura and Joshua were married in November 2012. Also in November, Joshua moved to Huntsville, Alabama, and began working for Qualitest Pharmaceuticals (Qualitest).

On January 29, 2013, Laura filed a "Complaint for Modification," in Gage County District Court requesting permission to remove the minor children from Nebraska to Alabama, so that she and her husband could pursue an "excellent job opportunity in Huntsville, Alabama, which includes higher pay, job security and a better future." Laura also alleged that both parties' incomes had changed since the original divorce decree, warranting an adjustment/modification of the child support order. Also on January 29, Laura filed a "Motion to Transfer Case to a More Convenient Venue," and requested the action be transferred to Douglas County as neither Laura nor Bryan were living in Gage County--Laura was living in Douglas County and Bryan was living in Lancaster County. On February 28, the Gage County District Court filed its "Order to Transfer to More Convenient Forum," granting Laura's request to transfer the action to Douglas County District Court.

On March 11, 2013, Bryan filed his "Answer and Counter-Complaint." In his answer, Bryan generally denied Laura's allegations set forth in her Complaint for Modification. In his "counter-complaint," Bryan alleged that the parties should be awarded joint physical custody of the children, or in the alternative, that he should be awarded primary physical custody if Laura moved out of Nebraska. Bryan also sought a review of child support (if there was a change in custody) and an award of attorney fees. On March 13, Laura replied, and generally denied Bryan's allegations. On July 26, Bryan filed an "Amended Answer and Counter-Complaint," making additional allegations, but essentially sought the same relief as in his original "Answer and Counter-Complaint." On July 31, Laura replied, and generally denied Bryan's allegations.

Trial was held on August 13 and 16, 2013. At trial, both Laura and Bryan presented evidence which they assert supported their respective positions on removal and custody.

Laura's husband, Joshua, testified that he works for Qualitest in Huntsville, earning $75,563 per year. Joshua previously worked for Novartis in Lincoln, and he testified that according to his 2012 W-2 (which was received into evidence), he earned $64,938 that year. (We note that it is unclear whether this is representative of a full year's salary in light of his testimony that he moved to Alabama in November.) Joshua testified the FDA caught Novartis cutting corners in June 2011 and that on December 19, Novartis voluntarily stopped producing products due to concerns regarding the quality of their products. Joshua's job at Novartis directly related to helping Novartis comply with FDA rules. Novartis was still closed during the summer of 2012, 6 to 9 months after the original shutdown. Joshua testified that he started getting concerned about the site's ability to maintain a workforce and did not believe there was a long-term future for his position. He began searching for jobs in Nebraska, limiting himself to the Lincoln and Omaha areas, and applied with three companies; he did not get any interviews. Joshua, who has a bachelor's degree in biochemistry, testified that with his degree and area of focus (quality

control/quality assurance), there are not a lot of job opportunities in and around Omaha, aside from working for a few pharmaceutical companies.

Joshua was approached by a recruiter for Qualitest in mid-September 2012 regarding a quality assurance position, similar to the position he held at Novartis. He had a telephone interview at the beginning of October and an onsite interview in mid- to late October, and he accepted the job offer in early November. He testified that he did not take the job in Alabama just because it paid more, but that he also took the job because of advancement opportunities and because he felt there was more job security at Qualitest. Joshua moved to Alabama in November without Laura. He testified that when he left Novartis, the company was still not producing product.

Laura testified that she has always been the primary caretaker of Elle and Evan. She helps them with their homework and regularly attends parent-teacher conferences. She takes care of all of the children's medical appointments.

Laura took courses at a community college in Lincoln from 2008 through 2011, but she never finished her associate's degree. She was unemployed at the time of trial. She had previously worked at a company from May to November 2012, earning $12.25 per hour, but she lost her job when the company went out of business. She had been searching for jobs in Nebraska and had a few interviews, but no offers. Laura testified that if the court denies the removal, she will stay in Elkhorn and Joshua will stay in Alabama. If that happens, Laura testified that she would have to work and the children would need care before and after school. Laura had not pursued employment in Alabama, because if allowed to move, she plans to be a stay-at-home mother.

Laura has a home in Elkhorn, but she did not elaborate as to details. Laura and Joshua have not yet purchased a home in Alabama. However, Joshua testified that he had been preapproved for a $280,000 home loan. They plan on buying a home in Madison, Alabama, which is a suburb of Huntsville. Laura testified that the home they plan to purchase would be bigger than their home in Elkhorn (3,000 versus 2,000 square feet). Joshua testified that the new home would be "roughly the same or maybe a little bit more in square footage" than their home in Nebraska. Laura testified that the neighborhoods in Madison and Elkhorn are "very similar." Laura testified that she researched schools in Huntsville and Madison and that they were "the same or better" than the schools in Elkhorn, where the children currently attend.

Laura testified that if she were allowed to move to Alabama, she proposed allowing Bryan 6 to 8 weeks of summer parenting time and suggested Bryan be entitled to every spring break, every Thanksgiving holiday, and half of the Christmas holiday every year. Laura recognized that schedules would be subject to travel issues and said she would take all of the responsibility for transporting the children for Bryan's parenting time--driving the children to Nebraska, a 14- to 15-hour drive each way, at a cost of approximately $300 round trip for gas and food. Laura also proposed daily communication between Bryan and the children via telephone calls, "Skype," or other electronic communication. Additionally, Bryan would be able to visit the children in Alabama anytime he wishes (at his own expense), as long as he provides reasonable advanced notice.

Bryan testified that he has had the same girlfriend for the past 7 years, but they do not live together. Bryan lives in a two-bedroom apartment in Lincoln, but if he got custody of the

children, he would get a bigger place. Bryan testified that he has parenting time with Elle and Evan every other weekend, 5 weeks in the summers, and alternating holidays.

Bryan does not think that it is in the children's best interests to move to Alabama, because if the children move, there would be no parenting plan that was fair to the children and they would be "isolated" from Bryan and his family. Bryan's parents and one of his sisters live in York, Nebraska. Bryan testified that he and the children spend 95 percent of his summer parenting time in York with his family.

The district court filed its order on August 30, 2013. The district court found that Laura had a legitimate reason for leaving Nebraska. However, the district court found that it would not be in the children's best interests to permit their removal to Alabama, and thus, the court denied Laura's application for removal. After denying the removal, the district court found "no other convincing reason" to change custodial rights. The court further found that the current incomes of the parties did not warrant a modification of the child support order. Laura's motion for new trial was overruled. Laura now appeals.

## III. ASSIGNMENTS OF ERROR

Laura assigns that the district court erred in denying her permission to remove the minor children from Nebraska.

Bryan assigns and argues in his brief that the district court erred in determining that Laura had a legitimate reason for the proposed move. However, there is no designation of a cross-appeal on the cover of Bryan's brief, nor is a cross-appeal set forth in a separate division of the brief as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2012). Any party who fails to properly identify and present its claim does so at its peril. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999).

## IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013). An abuse of discretion occurs when a trial court bases its child custody decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and the evidence. *Id.*

## V. ANALYSIS

### 1. BURDEN OF PROOF

In her brief, Laura argues that the trial court "required [her] to meet a burden of proof above and beyond that required by other litigants and as required by case law." Brief for appellant at 7. She further states:

> Specifically, the trial court determined that on the quality of life issues that were comparable in Nebraska to Alabama, the same would result in finding the factor weighed against removal. Case law in Nebraska[,] however, clearly provides that if comparable the same should not be used to weigh in favor or against removal.

*Id.* In its oral ruling, the district court would often state that if a factor was balanced, it did not weigh in favor of removal.

In *Dragon v. Dragon*, 21 Neb. App. 228, 243, 838 N.W.2d 56, 67 (2013), the district court determined that the mother "'has the burden to prove that the minor child's housing [and schooling] *shall be improved* by relocating to New Mexico and [she] failed to meet that burden,'" and thus, the factors did not support removal. (Emphasis in original.) However, on appeal, we said, "By saying [the mother] has the burden of showing how housing [and schooling] 'shall be improved,' the trial court imposes a burden requiring a heightened level of proof that we have not previously required." *Id.* We explained that a parent requesting removal must show how the child's quality of life will be improved, and each of the factors contribute to the court's ultimate determination regarding the child's best interest. We noted that "[i]n previous cases, where the evidence does not establish any significant improvement . . . we have determined that the factor does not weigh in favor of or against removal." *Id.* at 243, 838 N.W.2d at 68.

Thus, to the extent that the district court in the instant case imposed a heightened burden of proof on Laura, such was incorrect. However, we review the record de novo on appeal and will apply the correct burden of proof in our overall analysis.

## 2. REMOVAL FROM STATE

The Nebraska Supreme Court in *Farnsworth v. Farnsworth*, 257 Neb. 242, 249, 597 N.W.2d 592, 598 (1999), stated:

> To prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. . . . After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. . . . Of course, whether a proposed move is in the best interests of the child is the paramount consideration.

### (a) Legitimate Reason to Leave State

The district court found that Laura had a legitimate reason for leaving Nebraska, namely her remarriage and her spouse's residing in Alabama. We agree. See *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002) (move to reside with custodial parent's new spouse who is employed and resides in another state may constitute legitimate reason for removal). We now turn to the children's best interests.

### (b) Children's Best Interests

In determining whether removal to another jurisdiction is in the children's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent; and (3) the impact such a move will have on contact between the children and the noncustodial parent, when viewed in the light of reasonable visitation. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). See, also, *Farnsworth v. Farnsworth, supra* (definitive "roadmap" for analysis of such cases first set forth).

### (i) Each Parent's Motives

The first consideration is each parent's motive for seeking or opposing the move. The record is convincing that both parents are acting in good faith. Laura wants to move to Alabama to live with her new husband. Bryan does not want Laura to move Elle and Evan to Alabama because the move would affect the parenting time that he has with the children. This consideration is essentially neutral.

### (ii) Quality of Life

For the second consideration, the *Farnsworth* court set forth a number of factors to assist trial courts in assessing whether the proposed move will enhance the quality of life for the children and the custodial parent. Factors to be considered include: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the children are interwoven with the well-being of the custodial parent. This list should not be misconstrued as setting out a hierarchy of factors. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

### a. Emotional, Physical, and Developmental Needs

In the instant case, there is no evidence that the emotional, physical, and developmental needs of Elle and Evan cannot be met in either Nebraska or Alabama. This factor is neutral.

### b. Children's Preference

The children's preference is a nonfactor in the instant case because neither child testified at trial.

### c. Enhancement of Income and Employment

Laura was unemployed at the time of trial. She had previously worked at a company from May to November 2012, earning $12.25 per hour, but she lost her job when the company went out of business. She had been searching for jobs in Nebraska and had a few interviews, but no offers. Laura had not pursued employment in Alabama, because if allowed to move, she plans to be a stay-at-home mother.

Joshua's starting salary at Qualitest in Alabama was $75,563 per year. Joshua testified that according to his 2012 W-2 (which was received into evidence), he earned $64,938 that year. (We again note that it is unclear whether this is representative of a full year's salary in light of his testimony that he moved to Alabama in November.) This is an increase of a little more than

$10,000 per year in income for Joshua. Joshua testified that he also feels like he has more job security at his current job and that there is room for advancement.

A custodial parent's income can be enhanced because of a new spouse's career opportunities, for purposes of determining the potential that removal of children to another jurisdiction holds for enhancing the quality of life of the parent seeking removal of the children. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). See, also, *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). Joshua's income in Alabama is approximately $10,000 per year more than he earned in Nebraska. This enhancement in income and employment weighs slightly in favor of removal.

However, the district court noted the $10,000 increase in Joshua's income would be "somewhat negated by the transportation costs of providing [Bryan] with parenting time, including gas, hotel and potentially, airfare." (Laura had testified that she would take all of the responsibility for transporting the children for Bryan's parenting time and that she plans to drive the children to Nebraska, a 14- to 15-hour drive each way, at a cost of approximately $300 round trip for gas and food.) Thus, the district court found that moving to Alabama does not "sufficiently" enhance Laura's income or employment.

What the court failed to recognize in its order, and only briefly mentioned in its oral ruling, is that if Laura is not given permission to remove the children to Alabama, she would stay in Nebraska and Joshua would continue to live in Alabama. Thus, if removal is denied, Laura and Joshua would have the expense of maintaining two households. The cost of maintaining two separate households would exceed $300 per month, as evidenced by exhibit 15, an accounting of Laura and Joshua's current monthly expenses wherein they reside in different states. Thus, the cost of maintaining two separate households if removal is denied would exceed the transportation costs Laura would incur if allowed to remove the children to Alabama (especially when considering that transportation costs would not be incurred every month). We acknowledge and have factored in Laura's testimony that if removal is denied, she would have to get a job in Nebraska (although she has not had success in obtaining employment despite her search), and that the children would need care before and after school, which would be an additional expense. After our de novo review of the record, we disagree with the district court and find that the enhancement of income and employment weighs slightly in favor of the move.

### d. Housing and Living Conditions

Laura has a home in Elkhorn, but she did not elaborate as to details. Laura and Joshua have not yet purchased a home in Alabama. However, Joshua testified that he had been preapproved for a $280,000 home loan. They plan on buying a home in Madison, which is a suburb of Huntsville. Laura testified that the home they plan to purchase would be bigger than their home in Elkhorn (3,000 versus 2,000 square feet). Joshua testified that the new home would be "roughly the same or maybe a little bit more in square footage" than their home in Nebraska. Laura testified that the neighborhoods in Madison and Elkhorn are "very similar." Based on the evidence presented, this factor does not prevent or favor the move.

### e. Educational Advantages

Laura testified that she researched schools in Huntsville and Madison and that they were "the same or better" than the schools in Elkhorn, where the children currently attend. Although she provided printouts of testing statistics for schools in Madison and Elkhorn, the two school systems do not use the same standardized tests. Therefore, a statistical comparison is not all that helpful. Based on the evidence presented, this factor does not prevent or favor the move.

### f. Quality of Relationship Between Children and Parents

Elle and Evan appear to have a quality relationship with both Laura and Bryan. This factor does not prevent or favor the move.

### g. Ties to Community and Extended Family

Laura and the children have no relatives in Alabama, other than Joshua. However, the children have several relatives in Nebraska. Although Laura is estranged from her parents and her brother, she and the children are close to her aunt and uncle who live in Nebraska. Bryan's parents and one of his sisters live in York. Bryan testified that he and the children spend 95 percent of his summer parenting time in York with his family. Under Laura's proposal that Bryan get up to 8 weeks of parenting time in the summer if removal was granted, Bryan and the children could continue to spend the majority of his summer parenting time with Bryan's family in York. The ties to extended family would not be affected, nor would they be enhanced. This factor neither favors nor prevents removal.

### h. Hostilities Among Parents

There was no evidence presented to the trial court that relocation would antagonize the relationship between the parties. In fact, Bryan testified that he and Laura had been very cordial over the years and that he thought they would be cordial again "once this is resolved." This factor does not prevent or favor the move.

### i. Well-Being of Custodial Parent

The final "quality of life" factor listed in *Farnsworth v. Farnsworth*, 257 Neb. 242, 251, 597 N.W.2d 592, 599 (1999), is consideration of "the living conditions and employment opportunities for the custodial parent because the best interests of the children are interwoven with the well-being of the custodial parent." This factor was not specifically addressed by the trial court, and given the facts of this case, we find that some discussion is warranted. In particular, we see "living conditions" to include something more than the physical environment in the proposed new place of residence. Since a comparison of the physical residences is considered under a separate factor, as is the custodial parent's employment or income enhancements, we view this factor to focus more on how the proposed new living conditions and employment impact the well-being of the custodial parent. In doing that, we consider not only the financial strain of maintaining two households versus one new household, but the emotional toll of a married couple living apart, and the impact of that separation on the custodial parent's well-being and how that might, in turn, impact the children. In the record before us, this factor

would certainly weigh in favor of removal, since keeping the custodial parent's family unit living together would certainly benefit the marital relationship, would eliminate the added costs of separate households, and would eliminate Laura's need for securing employment, which would also avoid daycare costs.

Since the children's best interests are interwoven with the well-being of the custodial parent, see *Farnsworth v. Farnsworth, supra*, when the primary purpose of the removal is to allow the custodial parent to move with a relocating spouse, it would seem that this factor might warrant greater weight when balancing the other quality of life factors, or perhaps more important, when balanced against the other two "best interests" factors. However, there is no rule of law that requires this factor to be accorded any greater weight than any other quality of life factor, and in fact, *Farnsworth* states that, with regard to quality of life factors, "[d]epending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted." 257 Neb. at 251, 597 N.W.2d at 599. We also note that even if the "quality of life" factors in total weigh more in favor of the removal than against, these factors together compose only one consideration out of the three considerations *Farnsworth* tells us to evaluate with regard to the children's best interests. We now move to the third and final consideration in the best interests analysis.

*(iii) Impact on Noncustodial*
*Parent's Visitation*

"[T]his consideration focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship." *Farnsworth v. Farnsworth*, 257 Neb. 242, 251, 597 N.W.2d 592, 599 (1999). And "[w]hen looking at this consideration, courts typically view it in the light of the potential to establish and maintain a reasonable visitation schedule." *Id*. The *Farnsworth* court noted that the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness, citing *In re Marriage of Herkert*, 245 Ill. App. 3d 1068, 615 N.E.2d 833, 186 Ill. Dec. 29 (1993).

Relocating to Alabama will undoubtedly have an effect on the time Elle and Evan get to spend with Bryan. Bryan currently enjoys parenting time every other weekend (Friday to Sunday), alternating holidays, and 5 weeks every summer. If Laura is allowed to remove the children to Alabama, Bryan would no longer have the ability to exercise his parenting time every other weekend, nor would he have the ability to attend school, sports, or other activities in which the children may become involved.

Laura recognized the impact this change would have on the relationship between the children and Bryan, and she therefore proposed changes to the parenting plan to include extended time with Bryan during holidays, school breaks, and summer vacation. She proposed allowing Bryan up to 6 weeks of summer parenting time (at trial she testified that she even offered him up to 8 weeks) and suggested Bryan be entitled to every spring break, every Thanksgiving holiday, and half of the Christmas holiday every year. Laura recognized that schedules would be subject to travel issues and said she would take all of the responsibility for transporting the children for Bryan's parenting time. The evidence presented is that Laura plans to drive the children to Nebraska, a 14- to 15-hour drive each way, at a cost of approximately $300 round trip for gas and food. Laura also proposed daily communication between Bryan and

the children via telephone calls, "Skype," or other electronic communication. Additionally, Bryan would be able visit the children in Alabama anytime he wishes (at his own expense), as long as he provides reasonable advanced notice.

As stated previously, we focus on the ability of the noncustodial parent to maintain a meaningful parent-child relationship, see *Farnsworth v. Farnsworth, supra*, and in doing that, we agree with the district court that this consideration weighs against removal. In this case, permitting the children to move to Alabama would reduce not only the frequency of contact the children could have with Bryan, but also the total amount of parenting time. Even Laura acknowledges that removal would result in a reduction in overall parenting time for Bryan, stating that "Bryan had the children approximately 81 days each year" and that "unless he traveled to Alabama himself, the proposed schedule for parenting time would afford Bryan anywhere from 43 to 71 days each year." Brief for appellant at 21. Additionally, the distance would also reduce, if not eliminate, Bryan's ability to attend activities during the school year in which the children may become involved. Driving from Lincoln to Elkhorn makes participation in such events a possibility, whereas, driving or flying to Alabama for such events would be time and cost prohibitive, at least on a regular basis. Laura's proposed parenting plan did not add more days to Bryan's existing parenting time, so what Bryan loses in frequent contact is not compensated for by more overall parenting time throughout the year.

Also, traveling between Alabama and Nebraska would have resulted in the children's being on the road for 14 to 15 hours each way in order to see their father. Laura testified as to the need to drive the children rather than allowing them to fly (due to ages and need for supervision), so any holiday or vacation time awarded to Bryan would be reduced by time lost in the 14- to 15-hour drive each way between the states.

In *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000), the Nebraska Supreme Court considered the impact of the mother's relocation from Nebraska to Canada on the ability of a father to maintain a meaningful relationship with his children. The *Kalkowski* court noted that in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), where the distance between Omaha and Denver, Colorado, would lessen frequency of visits, the distance was not one which would prevent the father from seeing his child on a regular basis. However, in the case before it, the *Kalkowski* court noted that the same could not be said of the distance between Nebraska and Canada, stating, "The greater distance, less direct travel connections, and the significant expense and time involved in traveling between the two locations are significant factors which the trial court properly considered." 258 Neb. at 1047, 607 N.W.2d at 517. In considering the impact of all the long distance driving on Bryan's parenting time, the trial court in the case before us likewise expressed concern about how this would adversely impact Bryan's time and relationship with the children. It is evident that the district court placed the greatest weight on this third consideration when evaluating the best interests of the children.

(c) Summary

As stated earlier, the evidence establishes a legitimate reason for the move to Alabama. In considering the children's best interests, we have reviewed the three considerations dictated by *Farnsworth v. Farnsworth, supra*: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the

custodial parent; and (3) the impact such a move will have on contact between the children and the noncustodial parent, when viewed in the light of reasonable visitation. Like the district court, we find that the motives of Laura for wanting to move, and those of Bryan in opposing the move, are based in good faith, and this consideration is therefore neutral. As for the quality of life consideration, with its nine factors, our de novo review shows that in total, this factor favors removal. However, when considering the third and final consideration, the impact of the move on contact between Bryan and the children when viewed in the light of reasonable parenting time, we agree with the district court that this consideration weighs against removal.

In sum, we have one neutral consideration, one consideration favoring removal, and one consideration weighing against removal. In reviewing the totality of all the factors as discussed above, the trial court's decision could have gone either way. When the evidence is that close, and although we may have viewed the evidence initially in a different way than did the trial court, we cannot say that the district court abused its discretion in denying Laura's request to remove the children to Alabama.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's order denying Laura's request to remove the children to Alabama.

AFFIRMED.